Abbott **SEKAQUAPTEWA**, Chairman of the Hopi Tribal Council of the Hopi Indian Tribe, for and on behalf of the Hopi Indian Tribe, including all Villages and Clans thereof, and on behalf of any and all Hopi Indians Claiming any Interest in the Lands Described in the Executive Order Dated December 16, 1882, Plaintiff-Appellee,

v.

Peter **MacDONALD**, Chairman of the Navajo Tribal Council of the Navajo Indian Tribe for and on behalf of the Navajo Indian Tribe, including all Villages and Clans thereof, and on behalf of any and all Navajo Indians Claiming any Interest in the Lands Described in the Executive Order Dated December 16, 1882, Defendant-Appellant,

Edward H. Levi, Attorney General of the United States, on behalf of the United States, Defendant.

Nos. 74–1936, 74–2215 and 76–1006.

United States Court of Appeals, Ninth Circuit.

Sept. 27, 1976.

George P. Vlassis (argued), of Brown, Vlassis & Bain, Phoenix, Ariz., for defendant-appellant.

John S. Boyden, Sr. (argued), of Boyden, Kennedy, Romney, & Howard, Salt Lake City, Utah, for plaintiff-appellee.

Before ELY and WALLACE, Circuit Judges, and CRARY, District Judge.*

* Honorable E. Avery Crary, Senior United States District Judge for the Central District of California, sitting by designation.

CRARY, District Judge:

The three consolidated appeals here before the Court are the most recent in the line of cases, the genesis of which is the Executive Order of December 16, 1882, creating a Hopi and Navajo Reservation of some 2,500,000 acres in northeastern Arizona. The portion of the Reservation in controversy is the area designated as the joint use area of the two tribes. In *Healing v. Jones,*174 F.Supp. 211 (D.C.Ariz., 1959) (*Healing I*), a Three-Judge District Court first decided that the determination of the Tribes' equitable rights and interests in the Reservation lands presented a justiciable question and hence the Act conferring jurisdiction (Act of July 22, 1958) was a proper exercise of Congressional power. The Three-Judge Court in *Healing v. Jones,* 210 F.Supp. 125 (D.C.Ariz., 1962), aff'd 373 U.S. 758, 83 S.Ct. 1559, 10 L.Ed.2d 703 (1963), (*Healing II*), decided on the merits that the Hopi was entitled to exclusive possession of a portion of the Reservation (Land Management District 6) and that as to the remainder, the joint use area, the two tribes had joint, undivided and equal interests, subject to the trust title of the United States.

The District Judge, Chief Judge Walsh, whose orders are involved in each of the three appeals before this Court, was a member of the Three-Judge Court in *Healing I* and *II.*

The Navajo far outnumber the Hopi and over the years had taken over the area of the Reservation to a great extent. Neither the Government nor the Navajo sought to comply with the decree of the District Court, and in 1970 the Hopi Tribe petitioned the District Court for an order of compliance or writ of assistance to enforce its rights in the Reservation area. The District Court denied the petition on the grounds it did not have jurisdiction to issue the order or writ. By decision in *Hamilton v. Nakai,* 453 F.2d 152, 162 (9th Cir. 1971) (*Hamilton I*), this Court reversed and remanded the matter holding that the District Court had jurisdiction and authority to issue a writ to enforce the judgment in *Healing II,* supra, and remanded the case for further proceedings.

On remand, the District Court held evidentiary hearings and on October 14, 1972, signed and filed its Findings of Fact and Conclusions of Law and entered an order of compliance and writ of assistance.[1] In sum-

1. ORDER OF COMPLIANCE. The plaintiff in the above-entitled action having filed his Petition for an Order and Writ of Assistance on March 13, 1970; and following an appeal and decision by the United States Court of Appeals for the Ninth Circuit and denial of a Petition for Writ of Certiorari by the Supreme Court of the United States on May 22, 1972, this Court heard and received evidence adduced by the parties hereto, and having adopted its Findings of Facts and Conclusions of Law herein on September 7, 1972, and having heard the arguments of the parties as to the proposed relief on September 30, 1972; and good cause appearing therefor,

IT IS ORDERED, ADJUDGED, AND DECREED:

That the Defendants be and they are hereby ordered and directed to grant and permit the joint use and possession of the surface, including all resources, in and to all of the Executive Order Reservation of December 16, 1882, lying outside of the boundaries of Land Management District 6 as defined on April 24, 1934, to the Hopi Indian Tribe and the Navajo Indian Tribe, share and share alike.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED AS FOLLOWS:

1. Defendants shall forthwith commence reduction of livestock in the Joint-Use Area of the 1882 Executive Order Reservation and within one (1) year from the date of this Order complete reduction of Navajo livestock to one-half ($\frac{1}{2}$) of the carrying capacity as determined by the Soil and Range Inventory of the 1882 Executive Order Reservation (exclusive of District 6) dated 1964.

2. Within one (1) year from the date of this Order a new Range Reconnaissance to determine the present carrying capacity of said area shall be completed by the United States, and immediately thereafter a further reduction of livestock to the actual carrying capacity shall be commenced by Defendants and be completed within six (6) months from such commencement.

3. Commencing one (1) year from the date of this Order, livestock may be grazed upon the Joint-Use Area of the 1882 Executive Order Reservation, only after new permits therefor have been issued by the Bureau of Indian Affairs, and all prior existing permits shall be deemed cancelled as of that date. Thereafter,

mary, the order of compliance required that the Navajo reduce their livestock to one-half of the carrying capacity of the joint use area as determined by a 1964 soil and range inventory of the Reservation. They had one year, until October 14, 1973, within which to complete this reduction. Within a year from the date of the order a new survey was to be made by the United States and further reductions of livestock, to one-half of the actual carrying capacity as evidenced by that survey, was to be accomplished within six months thereafter. The order further provided that on October 14, 1973, all grazing permits were to be deemed cancelled and new permits were to be issued by the Bureau of Indian Affairs. Such cancellation was reaffirmed by the Court's order of January 25, 1974, but no new per-

mits were issued as of the date of the contempt order, May 29, 1974. The new permits were to be allotted by the Tribes to their individual members and each Tribe was to be limited to permits up to one-half of the carrying capacity of the area. The order also restricted construction of new Navajo dwellings in the joint use area and required the United States to present to the Court within sixty days a plan to facilitate and implement the order as to the reduction of livestock by the Navajo and prevention of damages to and misuse of the range land in effecting such reduction.

On April 23, 1973, the Court approved and adopted the plans proposed by the Government for implementing the order of compliance and detailed the action to ac-

permits may be issued to either or both tribes or individual tribal members of said tribes as the respective tribal councils of said tribes shall direct.

4. Commencing one (1) year from the date of this Order, permits covering not more than one-half (½) of the carrying capacity shall be issued to the Navajo Tribe or members thereof, and permits covering not more than one-half (½) of such carrying capacity shall be issued to the Hopi Tribe or members thereof. Neither tribe, including the members thereof, shall at any one time hold permits which in total cover more than one-half (½) of the carrying capacity.

5. From the date of this Order all income from said Joint-Use Area to the Navajo and Hopi Tribes, including but not limited to income from mineral production and sales, leases, trader license fees, rights-of-way grants, and licenses shall be divided equally between said tribes. However, profits and gains from livestock use permitted as hereinbefore provided shall be the sole property of the permittee. Grazing fees may be assessed and collected in the future by either tribe from individual permittees of the assessing tribe and shall inure to the benefit of said tribe without accounting to the other tribe.

6. The tribes shall exchange copies of all existing leases, easements, contracts, or other documents together with written descriptions of all oral agreements, which relate to the Joint-Use Area or businesses or improvements located thereon.

7. No new construction shall be permitted on the Joint-Use Area without a permit issued jointly by the two tribes, except that the Hopi Tribe shall be permitted to construct that number of dwellings or other improvements equal to those Navajo dwellings and other improve-

ments which are presently existing or are now under construction in the Joint-Use Area.

8. Within sixty (60) days from the date of this Order the United States of America shall present to this Court for its approval a plan to facilitate and implement this Order with relation to prevention of damage to, and misuse of, the rangeland as specified in Paragraphs 1 and 2, above.

9. Within ninety (90) days from the date of this Order the United States of America shall present to this Court for its approval a plan to facilitate and implement this Order, except with relation to prevention of damage to, and misuse of, the rangeland.

10. The plans required by this Order shall take effect upon approval of such plans by this Court.

11. Should Congressional legislation be enacted expressly conflicting with any of the specific provisions of this Order, this Court retains jurisdiction to make such changes and further orders as may be required to correlate this Order with any conflicting statutory provisions. All other provisions of this Order not in conflict with statutory provisions shall remain in full force and effect.

12. The Clerk of this Court shall issue a Writ of Assistance directing the Defendants herein to comply with the foregoing Order.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED:

That matters and issues concerning accounting and restitution and as to liability of the United States in respect thereto, if any, to the extent this Court has jurisdiction, are expressly reserved for later consideration and hearing.

Dated this 14th day of October, 1972.

/S/ James A. Walsh
JAMES A. WALSH
United States District Judge

complish the reduction of Navajo livestock by October 14, 1973, and the restriction of Navajo construction on the joint use area.

The Navajo appealed from the order of compliance and portions of the Government plan. The United States did not appeal.

This Court reaffirmed the subject matter jurisdiction of the District Court and ruled that neither the order of compliance nor the adopted plan for the utilization of the joint use area constituted impermissible partition of the area, and that the order and the Government plan must be carried out, observing, "If, as appellant appears to suggest, compliance will not be voluntarily forthcoming, then the district court possesses an ample reservoir of power to command respect for its orders." *Hamilton v. MacDonald,* 503 F.2d 1138, 1146 (9th Cir. Sept., 1974) (*Hamilton II*).

The Government moved the District Court on October 17, 1973, for an order extending the period of compliance from October 14, 1973, to October 14, 1974, and the Navajo sought an extension to October 14, 1975. The District Court, on January 25, 1974, denied the motion and reaffirmed its order that all pre-existing permits were cancelled as of October 14, 1973. This portion of the order was appealed by the Navajo in 74–1936, one of the three appeals presently before this Court.

Following hearing on a Hopi motion to show cause, May 29, 1974, the defendants McDonald and the Navajo Tribe were cited for contempt of Court for failure to reduce livestock and to control new construction as ordered. The Court further ordered the

Navajo to commence reduction of livestock within five days from the date of the order, the reduction to ".* * * be pursued without regard to the voluntary compliance of individual Indians." A fine of $250 per day was imposed on the defendants until the livestock of the Navajo within the joint use area "is reduced to 8,139 sheep units year round."

The Navajo appealed the contempt order which is presently before this Court as appeal No. 74–2215.

Congress, on December 22, 1974, enacted Public Law 93–531 (1974 Act), 25 U.S.C. 640d, et seq. This statute provides for the appointment of a mediator to "assist in the negotiations for settlement and partition of the relative rights and interests as determined by the decision in * * * *Healing v. Jones* * * *." It further provided that if no voluntary agreement were reached within 180 days the District Court was "authorized to make a final adjudication including partition of the joint use area." Section 640d–18 [2] of the law directed the Secretary of the Interior to forthwith commence reduction of livestock of the Navajo in the joint use area as provided in that Section.

Following this Congressional action and on July 11, 1975, this Court remanded the pending appeals 74–1936 and 74–2215 to the District Court for the purpose of that Court determining the effect of the 1974 Act on its prior orders.

District Judge Walsh, on October 14, 1975, held that the cases were not mooted by the 1974 Act and returned them to this

**2.** § 640d–18. Reduction of livestock within joint use area; institution of conservation practices; survey location of monuments and fencing of boundaries

(a) Notwithstanding any provision of sections 640d to 640d–24 of this title, or any order of the District Court pursuant to section 640d–2 or 640d–3 of this title, the Secretary is authorized and directed to immediately commence reduction of the numbers of all the livestock now being grazed upon the lands within the joint use area and complete such reductions to carrying capacity of such lands, as determined by the usual range capacity standards as established by the Secretary after December

22, 1974. The Secretary is directed to institute such conservation practices and methods within such area as are necessary to restore the grazing potential of such area to the maximum extent feasible.

(b) The Secretary, upon the date of issuance of an order of the District Court pursuant to sections 640d–7 and 640d–2 or 640d–3 of this title, shall provide for the survey location of monuments and fencing of boundaries of any lands partitioned pursuant to sections 640d–7 and 640d–2 or 640d–3 of this title.

Pub.L. 93–531, § 19, Dec. 22, 1974, 88 Stat. 1721.

Court with a memorandum in which he stated, among other things, that the Act was entirely in harmony with the Court's orders involved in the appeals and that nothing in the Act or in the legislative history discloses "any intention on the part of Congress to modify or alter the orders of this Court but on the contrary, a proposed amendment, which would have superseded the orders of the Court immediately failed of passage." The District Court, by a second order of the same date, October 14, 1975, determined that the Secretary's new five-year plan for livestock reduction was not authorized by Section 640d–18 and ruled that the Hopi motion "for an order directing the United States to proceed with reduction of livestock in the joint use area, *without regard to the voluntary compliance* of individual Indians is hereby granted and the United States is hereby directed to so proceed *immediately* and in accordance with the previous orders of this Court." [Emphasis added.]

The Navajo appeal, 76–1006, from the order of the District Court returning the two appeals to this Court, supra, is now pending. The United States also appealed from the October order but stipulated to dismiss its appeal on March 19, 1976.

This Court, on February 18, 1976, denied the Hopi motion to dismiss the Navajo appeal, 76–1006, without prejudice.

### APPEAL 76–1006

■ The Court concludes it has jurisdiction of this appeal under Section 1291, Title 28, U.S.C., and that appellant MacDonald has standing to contest the October 14, 1975, order. The appeal is the last of the three appeals filed but is here considered first since it involves the effect of the 1974 Act, Title 25, U.S.C. §§ 640d, et seq., on the issues involving reduction of livestock by the Navajo. The specific issue is whether, after the enactment of the 1974 Act, the District Court had jurisdiction to order livestock reduction as this Court had determined it did under the Act of 1958. *Hamilton v. Nakai,* (*Hamilton I*) 453 F.2d 152, 157. If Section 640d does not remove the

jurisdiction of the District Court to order livestock reductions and to cancel grazing permits in the joint use area under the Act of 1958, then other issues in the appeals in 74–1936 and 74–2115 will be mooted.

■ The Navajo assert that the enactment of 640d, et seq., and particularly Section 640d–18 (Footnote 2) removed the jurisdiction of the District Court to grant relief with respect to the livestock reduction by specifically directing the Secretary of the Interior to commence reduction of livestock in the joint use area, and that the only jurisdiction left in the District Court in this regard is the review of the action under the Administrative Procedure Act, 5 U.S.C. § 706.

Two factors mitigate against this interpretation; first, the statute itself indicates that the District Court is to retain full jurisdiction over the supplemental proceedings in *Healing v. Jones* without any indication of intent to limit the possible remedies which the Court may employ to enforce the judgment in that case, and second, the legislative history of the Act does not evidence any intent of Congress to alter the holding of this Court in *Hamilton I* or *II,* supra.

It is clear that Congress contemplated the continued jurisdiction of the District Court in controlling the supplemental proceedings in the *Healing* case. Its continued reference to that case in the statute and the referral of settlement agreements or recommendations to the District Court for approval or modification discloses Congress' awareness of the continuing proceedings in the *Healing* case. The statute was enacted after the *Hamilton* cases, wherein this Court held that the order of compliance of October 14, 1972, was a proper exercise of jurisdiction by the District Court in enforcing the judgment in *Healing v. Jones,* yet nowhere in the statute does Congress express any intent to limit the relief which the District Court could grant in enforcing the ruling in *Healing,* that the Hopi and Navajo held the joint use area as joint tenants. Congress, being aware of the rulings of this Court in the *Hamilton* cases, surely would have made specific provisions

to remove the power of the District Court to take the action it did in this matter if it had so intended.

The legislative history of the 1974 Act is enlightening as to the intent of Congress. The debate in the House discloses that Congress did not intend to supersede the existing Court orders but instead intended, by the section in question, to further those orders.

Representative Steiger of Arizona, speaking in committee in opposition to a proposed amendment which would have stayed the proceedings in *Healing* until the end of the settlement negotiation period provided for in Sections 3 and 4 of the Act, 25 U.S.C. § 640d–2 and 3, stated that the amendment was not in the spirit in which the proceedings had been conducted and it would quash the rulings in *Healing v. Jones*, "it would quash the four court orders, including the contempt order which the Navajo are now in contempt of Court for not removing the livestock   *   *   *."

Representative Meeds said, "I think we have absolutely no business going back and attempting to undo what the Court has done under these supplementary proceedings of *Healing v. Jones*. That would be the effect of the   *   *   *   amendment." The amendment was not adopted.

The House bill was not approved by the Senate although several provisions were adopted, including 640d–18. In the Senate report on the bill it was stated, "   *   *   *   we have seen the Court's order to reduce livestock will inevitably lead to some relocation of people. At present there is no statutory authority to compensate people who must move because of the loss or to follow their livestock. This is a gap which be believe must be filled." Two million dollars was appropriated for the funding of the Secretary's livestock reduction plan in December, 1975, but the above quoted portion of the Senate report suggests that the intent was not to override the Court's orders. In the Senate debate on the bill which became law, three Senators, Goldwater, Fannin and Scott, who supported the bill, expressed the intent that the primary purpose of the legislation was to provide the Court with authority to partition, which authority the Court had determined it lacked in the *Healing* case.

Senator Goldwater, in the debate on the final bill, referred on two occasions to the four Court decisions that the Navajo had defied, stating that they were presently paying $250 a day under order of the Court "because they will not obey the Court." He obviously did not believe the bill superseded the Court's orders.

The final bill, as approved by the Senate and House, evidences the fact that Congress did not intend to supersede the existing Court orders but instead, to further them.

The learned District Judge, in his order of October 14, 1975, returning the appeals to this Court, ruled that the 1974 Act was entirely in harmony with the Court's orders involved in the appeals. In a separate order of that date the District Court stated, "2. That Section 19, of the Act   *   *   *   directed the Secretary   *   *   *   to begin to do immediately what the orders of the Court required."

We agree. The order appealed from is AFFIRMED.

## APPEAL NO. 74–1936

This Navajo appeal is from the order of the District Court of January 25, 1974, denying motions of the Navajo and the United States to extend the time for compliance with the October 14, 1972, order from October 14, 1973, to October 14, 1975, and to October 14, 1974, respectively. Four issues are raised in this appeal, (1) the Interior Department regulations were not followed in cancelling the permits, (2) Notice of hearing and a hearing were required by statute and due process as to individual Navajo, (3) The District Court lacked jurisdiction to modify its order of compliance currently on appeal, and (4) Is the order appealable?

■ This Court's affirmance of the District Court's order in appeal No. 76–1006, supra, and its ruling that Congress, in enacting Title 25, U.S.C. § 640d, did not intend to remove the jurisdiction and power

of the District Court to grant appropriate relief to enforce the judgment in the *Healing* case, leave only the due process issue since any question as to the usurpation of or exhaustion of agency authority as to cancellation or issuing of permits should have been raised by the Navajo in their appeal from the 1972 order in *Hamilton II.* However, approaching this appeal on the merits we find that this Court determined in *Hamilton I* that the District Court has wide discretion in formulating orders to enforce the decree in *Healing II* and had power under the 1958 Act to reduce livestock in the joint use area, stating, "[The District Judge] can tailor the relief to be afforded to the facts that confront him." In appeal No. 76–1006, we have now held that Section 640d does not affect that power. Consequently, the doctrine of primary jurisdiction of an agency does not apply. It is also to be remembered that the District Court adopted the Government's livestock reduction plan by its order of April 23, 1973, which order was held to be valid in *Hamilton II.*

■ The Navajo urge that the individual members of the Tribe are entitled to notice of the cancellation of their permits and a hearing on the issue by virtue of due process. They contend that although the Tribe is representing the individual Indians pursuant to the 1958 Act, notice must be given to all members of a class. *Eisen v. Carlisle and Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), a classic class action case. A typical class action is not here involved. It appears the Navajo claim to the joint use area has been a Tribal claim and the claim was adjudged by the Court as a Tribal claim, not as a claim of individual members. The Navajo points to the requirement of the Administrative Procedure Act and agency regulations as to notice and hearing. Those procedures are not applicable because Congress, by the provisions of the 1958 Act, vested in the District Court of Arizona the authority to determine the rights and interests in the joint use area. Therefore, the Court, not the agency, has jurisdiction.

■ The testimony of the Tribal Chief MacDonald and another Navajo official evidenced that they had personally informed individual Navajos in the joint use area, in official meetings, of the order re cancellation of their permits. The claim that the due process clause requires a hearing for the individual Navajo permittee where the Tribe was a party to the suit is not convincing, since the wording of the 1958 Act indicates that Congress intended that the Tribe represent the interests of all members in the dispute and the Tribe has so represented the individual members and their interests in the litigation. Congress apparently recognized that it was impractical to bring before the Court all interested individual members of the Navajo Tribe and therefore designated the Chairman of the Tribal Council to represent their interests. There is no substantial basis for the claim that Congressional action has the effect of depriving the Navajo of their property without due process of law. *Winton v. Amos,* 255 U.S. 373, 391–392, 41 S.Ct. 342, 65 L.Ed. 684 (1921).

The order of the District Court, January 25, 1974, denying the motions to enlarge the time to comply with the October 14, 1972, order of compliance, including the cancellation of all existing grazing permits, is AFFIRMED.

### APPEAL NO. 74–2215

The Navajo appeal the May 29, 1974, order of the District Court directing immediate reduction of livestock and citing the Navajo for contempt for failure to reduce livestock and for their new construction in the joint use area in violation of the orders of October 14, 1972, and April 23, 1973.

It is urged as grounds for this appeal, (1) they were not able to comply with the order, (2) the prior orders of the District Court lacked specificity, (3) no clear and convincing evidence of failure to comply with the order, and (4) the contempt provisions of the order constituted a modification of a prior order then on appeal.

The general principle that one is not in contempt for noncompliance with an order

he is not capable of performing is not in controversy. The issue here is whether the defendants MacDonald and the Navajo Tribe took all of the reasonable steps within their power to insure that the Tribe, and the members it represents, complied with the order of the Court. The authorities cited by the appellee do not deal with Indian Tribes but lend enlightenment by analogy to the argument that MacDonald and the Tribe may be held in contempt if they have not taken all reasonable steps within their power to insure compliance, by the individual members of the Tribe, with the order for reduction of livestock and against new construction in the joint use area.

Both sides refer to the testimony before the District Court. The appellants outline the efforts of the Tribe and Chairman MacDonald have made to comply with the order, including (1) the encouragement of additional livestock sales, (2) the development of a detailed proposal for the sale and removal of 29,200 sheep units, setting forth the procedures by which the Navajo Tribal Range Livestock Department would assist the United States in conducting sales, and (3) informing individual Navajo of the requirement of the Court order to reduce their livestock and refrain from new construction in the Area. Chairman MacDonald testified with respect to the termination of grazing permits, that Section 204 of the Navajo Code provided, with regard to grazing, "That any Indian who shall allow his stock to graze on tribal lands without a grazing permit shall be deemed guilty of an offense and upon conviction thereof shall be sentenced to hard labor for a period not to exceed three months or shall be fined not to exceed $100, or both. In lieu of cash, this fine, if levied, may be collected in livestock." He said the provision of this Code section had not been enforced by prosecutions because it was his understanding that jurisdiction over grazing rights had been vested in the Department of Interior, not the Navajo Tribe, since 1969. He, however, was cognizant of the Court's order cancelling all grazing permits as of October 14, 1973, and the denial of the request for extending the time for complying with that

order, and stated, "We went out and informed the people what the order of October 14, 1973, is all about and we had asked them to comply * * *." The Tribe authorities and the Navajo-Hopi Land Dispute Commission of the Navajo Tribe were instructed "to move forward * * * within our power to effect the Court order." The testimony of Chairman MacDonald disclosed that the Tribe did have jurisdiction over the Navajo living in the joint use area and the Tribal courts, though sitting outside the area, had jurisdiction over the members in the area. It is to be noted that Section 1251 of the Navajo Code reads: "A Police Department is established in the Executive Branch of the Navajo Tribal Government." Title Two, Section 904 states, in defining the duties of the Tribal Chairman under Paragraph (A) of Section 903: "He shall have ultimate responsibility for the power and effective operation of Tribal Executive Divisions and Departments." Section 283 of Title Two provides that "Responsibility for directing and supervising the personnel of executive or business staff of the Tribe shall be in the Chairman."

It was stated by Chairman MacDonald that he did not believe the grazing permits were to be cancelled until some official notice was received notifying everyone that the permits were cancelled. In view of the advice given to the members of the Tribe in the joint use area of the Court's order cancelling the grazing permits, the instructions to comply with that order and the alleged efforts to comply, ineffective and meager as they were, the position as to the expectation of or need for an official notice is not convincing. The defendants made no effort to impose sanctions nor, as pointed out by the Court, did they pass any regulations which they could have enforced in an effort to comply with the Court's order.

Samuel Pete, the Director of the Navajo-Hopi Land Dispute Commission, formed in August, 1972, and which is now composed of nine members of the Navajo Tribe, testified that they had been notifying the Navajo in the joint use area since the Court

order was issued, "telling them explicitly what is contained in this particular order."

He read the Court order dated October 14, 1972, cancelling the grazing permits as of October 14, 1973, when he took office on January 10, 1973, "and it was reaffirmed on January 25th (1974) order * * *."

The members of the Tribe, through Chapter meetings, were advised of the appeal from the Court's January 25, 1974, order. In this regard, Mr. Pete testified, "We have told them that we have taken appeal from the January 25, 1974, Court order and that this is pending. And that we have to comply with the Court order because this is law." He said he personally felt, as stated in the appeal, No. 74–1936, supra, that "there were existing procedures which should be followed in revoking our grazing permits, * * * but it wasn't," however, he "didn't say the entire Navajo Tribe took that position."

The efforts on the part of the Navajo to comply with the Court's orders, as related by Mr. Benjamin, Project Officer for the joint use area administrative office in Flagstaff, constituted a proposal by the Navajo for money to hold public sales but this proposal contained no dates and no schedule for stock reduction. In this connection, Benjamin, on Feburary 22nd, requested the Navajo to furnish, by March 15, 1974, its proposed schedule as to the times for reduction of livestock in the joint use area. The Navajo failed to furnish such schedule but on April 10, 1974, delivered a proposal in the form of a letter dated March 21, 1974, requesting $92,600 from the United States to enable the Navajo Tribal Range Livestock Department to assist the Federal Government in conducting livestock sales and fixing corrals in the joint use area. The letter contained no dates for sales or reduction of livestock. Money was also sought for the removal from the joint use area of 29,200 sheep units, the said sheep units to consist of 1500 horses, 1800 cows, 50 mules, 50 donkeys and 14,000 sheep. A horse was rated as 5 sheep units and a cow as 4. The Navajo had estimated that they had approximately 120,000 sheep units in

the joint use area in 1972 and claimed substantial losses in livestock during the winter of 1972–73.

Some livestock sales were held both in and outside the joint use area but most of the cattle sold were the yearly increase. It is not clear that these sales were not regular annual livestock sales normally held by stock breeders nor what, if any, sales involved stock which was not normal yearly increases.

In its Findings of Fact, the District Court, on May 29, 1974, found that the new range reconnaissance report (August, 1973), as directed to be made in paragraph 2 of the Order of Compliance, determined the actual carrying capacity of the joint use area to be 16,278 sheep units. The reduction of livestock was small when compared to the reduction to 8,139 sheep units by the Navajo as required by the Court's orders to meet the carrying capacity of the Area.

The Court found further that in spite of vague claims, livestock sales, investigation of alternative grazing land for Navajo livestock, and removal of unbranded livestock from the Area, " * * * the facts are that the Area has been for years, and now is, severely overgrazed by Navajo livestock and such livestock presently grazed in the Area greatly exceeds 8139 sheep units."

Although the record is not clear as to the number of violations of the prohibition against new construction in the joint use area, it does support the Court's finding that "twenty or more structures have been erected in the Joint Use Area in violation of the Order."

The Court's Findings of Fact signed May 29, 1974, are supported by substantial evidence and fully justify the Court's Conclusions of Law, which state:

"1. Defendant MacDonald appears herein pursuant to authority granted by, and by virtue of, the Act of July 22, 1958, 72 Stat. 402, as Chairman of the Navajo Tribal Council for and on behalf of the Navajo Indian Tribe, including all villages and clans thereof, and on behalf of any and all Navajo Indians claiming any interest in the

lands described in the Executive Order dated December 16, 1882.

2. Neither the defendant MacDonald nor the Navajo Tribe has taken the reasonable measures within their power and available to them to bring to an end the unlawful grazing, monopolizing, and damaging of the range lands within the Joint Use Area by members of the Navajo Tribe.

3. Neither defendant MacDonald nor the Navajo Tribe has endeavored in good faith to comply with the Court's directions in Paragraphs 1 and 2 of the Order of Compliance looking to the reduction of Navajo livestock in the Joint Use Area.

4. Neither defendant MacDonald nor the Navajo Tribe has taken the reasonable measures within their power and available to them to bring to an end and eliminate construction of improvements by members of the Navajo Tribe within the Joint Use Area which are in violation of Paragraph 7 of the Order of Compliance.

5. The reasons offered by defendant MacDonald and the Navajo Tribe for non-compliance with the Court's orders for reduction of livestock and for control of new construction upon the Joint Use Area do not constitute good cause or reasonable justification for such non-compliance.

6. Jurisdictional sanctions are necessary in these proceedings to coerce defendant MacDonald and the Navajo Tribe into complying with the Court's orders.

7. Plaintiff is entitled to have this court exercise its equitable power to award him attorneys fees and costs in connection with these proceedings and any further proceedings necessarily taken hereafter herein to enforce the orders of this Court."

During the contempt hearings the District Court observed it believed that since the land in the joint use area was Tribal land that Chairman MacDonald and the Tribal Council could have passed regulations which would have had the force of law and subjected individual Indians to sanctions for failure to comply.

The appellants, in support of their position, repeated their argument as to the inherent difficulties in complying with the orders but those arguments made in prior opposition to compliance and, as the Court said in *Hamilton II*, "there was no occasion for the district court to 're-balance' the hardship imposed on individual members of the Navajo Tribe * * *. That balance was struck in *Healing II*, and is not the law of the case." 503 F.2d at 1145, supra.

■ We conclude that the District Court correctly took the position that the May 29, 1974, contempt order was in the nature of an enforcement order of its previous order of compliance which had not been stayed on appeal. To hold otherwise would deny the District Court the power to enforce its unstayed orders while they were on appeal.

The appellants' position that there was reason to believe voluntary compliance with the Court's order was contemplated is of little consequence by reason of the statement by the District Court during the hearing on August 25, 1973: "I am pointing out that the Court's Order of Compliance very definitely indicates that if it can't be done voluntarily that it is going to be done involuntarily."

■ This Court's perspective of these consolidated appeals, having in mind the multiple and repeated orders of the District Court to effect compliance with *Healing II,* as instructed by this Court, and what may be described as little real conscientious effort on the part of the appellants to comply with those orders, leads the Court to the conclusion that the appellants have not taken all the reasonable steps within their power to insure compliance with the orders by all concerned including the individual members of the Tribe.

The lapse of years since this Court determined the District Court had the authority to implement the judgment in *Healing II* and the great efforts by the District Court to comply as disclosed by the history of the various proceedings and orders, indicate conscious foot dragging on the part of the appellants. Their meager efforts to comply with the orders of the District Court create the impression described by appellees' coun-

sel as merely the tuning up of a band that never intended to play. This conduct is not in keeping with the illustrious heritage and traditions of this great American Indian Tribe.

The contempt order of the District Court is AFFIRMED.

Recapitulating, each of the orders of the District Court contested in appeals Nos. 74–1936, 74–2215 and 76–1006, are AFFIRMED.