**PEABODY COAL COMPANY, a Delaware corporation; and Southern California Edison Company, Plaintiffs,**

v.

**The NAVAJO NATION, Defendant,**

**and**

**Vernon Masayesva, Chairman of the Hopi Tribal Council of the Hopi Tribe, Intervenor.**

**No. CIV 88–0931–PCT–BMV.**

United States District Court, D. Arizona.

Aug. 9, 1994.

James E. Scarbaro, Arnold & Porter, Denver, CO, for the Hopi Tribe.

Eric N. Dahlstrom, Rothstein, Donatelli, Hughes, Dahlstrom, Kron & Schoenberg, Phoenix, AZ, for the Navajo Nation.

## MEMORANDUM–DECISION AND ORDER

VAN SICKLE, District Judge.

This case presents the issue of whether certain taxes imposed by the Navajo Nation are properly considered mineral proceeds for purposes of the Navajo–Hopi Land Settlement Act of 1974. The matter was tried to the court on March 15–18 & 28, May 2–3, and June 15–16, 1994. After consideration of the issues, arguments, and evidence, this court herein enters its findings of fact and conclusions of law.[1]

## I. FINDINGS OF FACT

### A. THE PARTIES

Plaintiff Peabody Coal Company ("Peabody") is a Delaware corporation authorized

---

1. The findings of fact and conclusions of law are entered pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. To the extent any findings of fact constitute conclusions of law, or any conclusions of law constitute findings of fact, they shall be so considered.

to and doing business in the Navajo Nation (also known as the Navajo Indian Reservation) within the State of Arizona. Plaintiff Southern California Edison Company ("Edison") is a California corporation, and is the Operating Agent for the Mohave Generating Station, a coal-fired electrical generating facility located in Laughlin, Nevada which purchases coal from Peabody. Defendant Navajo Nation and Intervenor Hopi Tribe (through Vernon Masayesva, former Chairman of the Hopi Tribal Council) are federally-recognized Indian tribes.

### B. GENERAL BACKGROUND

As noted in a report of the Senate Committee on Interior and Insular Affairs:

Both the Hopi and Navajo have occupied the American southwest for centuries.... "No Indians in this count[r]y have a longer authenticated history than the Hopi".... Archaeological evidence shows that groups ancestral to the Hopi were settled in Arizona and New Mexico before 1300 A.D. and perhaps as early as 600 A.D. In 1541 a detachment of the Spanish explorer, Coronado, visiting northeastern Arizona, encountered the Hopi living in mesa-top villages.

The Hopi still live in several villages in the same general area and pursue a life style not entirely dissimilar to that viewed by the Spanish explorers. The Hopi are a sedentary, village-based people, with an economy based on dry farming and grazing. Their crop fields are located near the villages in which they live. Besides raising crops, they also engage in livestock herding in areas near the mesas and travel to more distant points for ceremonial purposes, wood gathering, and hunting.

....

The time of the entry of the Navajo people into the Southwest is in question, but clearly the "recorded history of the Navajos does not extend as far back as that of the Hopi".... Available evidence suggests the Navajo were settled in northwestern New Mexico as early as 1500. They are mentioned in preserved journals for the first time in 1629; and it appears that they first entered what is now Arizona in the last half of the eighteenth century. Eventually, the Navajo spread into parts of what are now Arizona, New Mexico, and Utah. As a result of this process of migration and settlement, the Navajo came to surround the Hopi who had continued to reside in the same general area in northeastern Arizona.

Although some Navajos established farms which held them to fixed locations, in the main they were a semi-nomadic, grazing and hunting people who seldom gathered in cohesive communities. Families and kinship groups roamed rather extensive areas in search of forage and game. This required them to live in rude shelters known as "hogans" to which they returned whenever it was practicable.

S.Rep. No. 93–1177, 93d Cong., 2d Sess. 11–12 (1974) (citations omitted).

In 1882, President Chester A. Arthur signed an executive order which created a 2.5 million acre reservation (the "1882 Reservation") in northeastern Arizona for the use and occupancy of the Hopi and "such other Indians as the Secretary of the Interior may see fit to settle thereon." Exec. Order of December 16, 1882.

At the time the reservation was created, approximately eighteen hundred Hopis and three hundred Navajos occupied the reservation. *Healing v. Jones*, 210 F.Supp. 125, 137 (D.Ariz.1962), aff'd, 373 U.S. 758, 83 S.Ct. 1559, 10 L.Ed.2d 703 (1963). The Navajo population subsequently increased as Navajo Indians migrated and settled on the 1882 Reservation.[2] As the number of Navajos

---

2. As noted by the *Healing* court:

In 1882 there were only about three hundred Navajos living in the area. By 1900 this had increased to 1,826. In 1911 the Navajo population was estimated to be two thousand, and by 1920 this had grown to between twenty-five and twenty-seven hundred. The Navajo population climbed to 3,319 by 1930, and to about four thousand by 1936. About six thousand Navajos were living within the reservation in 1951. By 1958, the Navajo population probably exceeded eighty-eight hundred.
*Healing*, 210 F.Supp. at 145.

The Hopi population within the 1882 Reservation did not rise as dramatically. In 1882 there were 1,800 Hopis living in the area. *Id.* at 137.

living within the reservation began to outnumber the Hopi, land use conflicts developed between the Hopis and Navajos. *See generally id.* at 145–170. Efforts to resolve conflicting claims to the reservation land by agreement and administrative action failed, prompting Congress to resort to the courts. *See Sekaquaptewa v. MacDonald,* 575 F.2d 239, 240 (9th Cir.1978). In 1958, Congress waived the sovereign immunity of the Hopi Tribe and the Navajo Nation and authorized either tribe, or the Attorney General on behalf of the United States as trustee of the territory, to bring an action to determine the rights and interests of those parties in and to the 1882 Reservation and to settle title thereto. Act of July 22, 1958, Pub.L. No. 85–547, 72 Stat. 403. The Hopi Tribe subsequently filed an action to quiet title to the 1882 Reservation. In 1962, in *Healing v. Jones, supra,* a three-judge district court ruled that the Hopis were entitled to the exclusive possession of a small portion of the reservation known as "Land Management District 6." With regard to the remainder of the reservation, the district court ruled that subject to the trust title of the United States, the Hopi Tribe and the Navajo Nation had joint, undivided, and equal interests as to the surface and sub-surface. *Healing,* 210 F.Supp. at 132. The portion of the 1882 Reservation which lay outside the boundaries of Land Management District 6, and in which the Hopis and the Navajos held a joint interest, was known as the "Joint Use Area" ("JUA").

The *Healing* decision did not resolve the conflicts between the Hopis and the Navajos over the surface use of the 1882 Reservation. In 1970, the Hopi Tribe claimed that the Navajos had failed to comply with the district court's decree in *Healing* and petitioned the district court for an order of compliance to enforce its rights in the 1882 Reservation. The order ultimately entered by the district court required, *inter alia,* an equal division of all income from the exploitation of the JUA. *Hamilton v. MacDonald,* 503 F.2d 1138, 1142 n. 2 (9th Cir.1974). The order also required the Navajo Nation to reduce livestock grazing and confine construction on

the JUA. *Id.* That order was affirmed by the Ninth Circuit in *Hamilton v. MacDonald, supra.* A subsequent order holding the Navajo Nation in contempt for failing to reduce livestock and control construction was affirmed in *Sekaquaptewa v. MacDonald,* 544 F.2d 396 (9th Cir.1976), *cert. denied,* 430 U.S. 931, 97 S.Ct. 1550, 51 L.Ed.2d 774 (1977).

In another effort to resolve the ongoing land dispute, Congress enacted the Navajo–Hopi Land Settlement Act of 1974, codified at 25 U.S.C. §§ 640d *et seq.* ("Settlement Act"). The Settlement Act provided for the appointment of a mediator to assist in negotiating a settlement and partition of the rights and interests of the Hopi and the Navajo in the JUA. The district court was granted residual authority to make a final adjudication if a voluntary agreement could not be reached. 25 U.S.C. § 640d–3. When the mediation effort failed to produce a settlement, the district court divided the 1882 Reservation into Hopi partitioned land and Navajo partitioned land. The date of partition was April 18, 1979. The judgment of partition was consistent with the Settlement Act's mandate that any division of the 1882 Reservation would pertain to surface ownership only and would not affect the joint ownership status of the subsurface estate. Regarding the ownership of the subsurface estate, Section 7 of the Settlement Act provides:

> Partition of the surface of the lands of the joint use area shall not affect the joint ownership status of the coal, oil, gas, and all other minerals within or underlying such lands. All such coal, oil, gas, and other minerals within or underlying such lands shall be managed jointly by the two tribes, subject to supervision and approval by the secretary as otherwise required by law, and the proceeds therefrom shall be divided between the tribes, share and share alike.

25 U.S.C. § 640d–6. The district court's partition order was ultimately approved in *Sekaquaptewa v. MacDonald,* 626 F.2d 113 (9th

---

By 1951 the Hopi population had grown to 3,200. *Id.* at 169.

At the time of this trial, the Hopi and Navajo populations were estimated at about 10,000 and 200,000, respectively. Trial Tr. (3/15/94) at 18.

Cir.1980). After the partition of the JUA, each tribe had jurisdiction and authority over lands partitioned to it and all persons located thereon to the same extent as was applicable to other portions of their respective reservations. 25 U.S.C. § 640d–9(e)(1)(B).

In 1964, sixteen years before the partition of the 1882 Reservation, the Navajo Nation entered into a lease with Sentry Royalty Company ("Sentry") for the operation of a coal mine on Navajo Reservation lands north of the 1882 Reservation ("1964 Navajo North lease"). Two years later, Sentry entered into separate coal mining leases with both the Hopi Tribe ("1966 Hopi JUA lease") and the Navajo Nation ("1966 Navajo JUA lease") which granted to Sentry each tribes' respective undivided leasehold interest to a 40,000 acre parcel within the JUA. In 1968, Sentry assigned its rights in all three leases to Peabody, and in 1970, Peabody began mining coal at two mines—the Kayenta Mine and the Black Mesa Mine—located, in part, on the former JUA. The 1966 Hopi JUA lease and the 1966 Navajo JUA lease did not require the lessee (now Peabody) to sell coal to any particular purchaser. Under those leases, Peabody could sell all or any portion of the coal mined to any purchaser at its discretion.

On September 29, 1969, the Navajo Nation executed the Navajo Generating Station Lease ("1969 NGS lease") with Arizona Public Service Company, Salt River Project Agricultural Improvement and Power District, Tucson Gas and Electric Company, and other non-Arizona utility companies (collectively, the "NGS participants"). The 1969 NGS lease conveyed a leasehold interest to approximately 1,986 acres of land on the Navajo Reservation near Page, Arizona, for the purpose of constructing and operating a coal-fired thermal generating power plant—the Navajo Generating Station ("NGS"). The 1969 NGS lease did not require that the NGS participants purchase or obtain coal for use at the NGS from sources within the Navajo Reservation or within the JUA; they were free to purchase coal from any supplier. Nonetheless, pursuant to a long term coal supply agreement, the NGS lease participants purchase coal from Peabody at the Kayenta Mine and transport it by rail to the

NGS. In the 1969 NGS lease, the Navajo Nation agreed that it would not tax the NGS power plant, the NGS lease participants, the coal supplied to the power plant, or other property associated with the power plant. 1969 NGS lease, ¶ 7(e) at 22–24. Since there were no Navajo taxes in 1969, the agreement was essentially a promise not to tax in the future.

Pursuant to another long term coal supply agreement, a separate consortium of utilities, led by Edison, purchases coal from the Black Mesa Mine and transports it by slurry pipeline to the Mohave Generating Station in Laughlin, Nevada.

The land leased to Peabody under the 1966 Hopi JUA lease and the 1966 Navajo JUA lease was entirely within the former JUA that was partitioned by the district court in 1980, consistent with the strictures of the Settlement Act. The boundary line created by the partition was such that approximately ninety percent of the land leased to Peabody was partitioned to the Navajo Nation, while only ten percent was partitioned to the Hopi Tribe. Since the partition of the former JUA, virtually all of Peabody's mining activities under the 1966 JUA leases have taken place on Navajo partitioned land. The mine sites at issue in this case are located on Navajo partitioned land only. However, because the coal mined from those sites is part of the subsurface estate of the former JUA, the proceeds from that coal are subject to the "share and share alike" requirement of the Settlement Act.

In 1978, the Navajo Nation enacted a possessory interest tax ("PIT"), which is assessed on the value of all possessory interests within the Navajo Nation. A "possessory interest" is defined in the Navajo Tribal Code as "the property rights under a lease granted by the Navajo Tribe, including the rights to the lease premises and underlying natural resources." 24 Navajo Trib.Code § 204(1). The PIT applies to Peabody's leasehold interest in the subsurface estate located under Navajo partitioned land within the former JUA. The Navajo Nation also enacted a business activity tax ("BAT") in 1978, which is assessed on the gross receipts

from the sale of property produced or extracted within the Navajo Nation, and from the sale of services performed within the nation. *See* 24 Navajo Trib.Code §§ 402, 404. The BAT applies to Peabody's mining activities within Navajo partitioned land.

In 1985, the United States Supreme Court upheld the validity of the PIT and the BAT in *Kerr–McGee v. Navajo Tribe of Indians*, 471 U.S. 195, 105 S.Ct. 1900, 85 L.Ed.2d 200 (1985).

On November 20, 1987, Peabody and the Hopi Tribe executed amendments to the 1966 Hopi JUA lease. On the same day, Peabody and the Navajo Nation executed amendments to both the 1964 Navajo North lease and the 1966 Navajo JUA lease. All three amendments were approved by the Secretary of the Interior on December 14, 1987. The Secretary found that the amendments were in the best interests of the tribes and that they were "substantially equivalent in what each Tribe will receive under its respective lease, taking into account the overall transaction." Secretarial Approval at 1.

Neither the 1966 Hopi JUA lease, the 1964 Navajo North lease, nor the 1966 Navajo JUA lease, contained provisions regarding tribal authority to impose a tax on activity conducted under the leases. The 1987 amendments added tax provisions to the leases. However, the amendments contain different provisions relating to the taxing authority of each tribe over Peabody's operations.

The only provision regarding tribal taxation in the amendments to the 1966 Hopi JUA lease reads as follows:

Nothing contained in these amendments or in the Lease itself shall be construed either to confirm or deny the authority of the Hopi Tribe to tax operations under this Lease. No position taken by any person in the development or negotiation of these amendments shall be deemed relevant, or shall be introduced into evidence, in any proceeding contesting or asserting the validity of any tax measure enacted by the Hopi Tribal Council.

1987 amendments to the 1966 Hopi JUA lease, new Article XXIX, at 14 (hereinafter Amended 1966 Hopi JUA lease).

The provisions regarding tribal taxation in the amendments to both the 1964 Navajo North lease and the 1966 Navajo JUA lease include an express acknowledgment by Peabody of the right and authority of the Navajo Nation to levy the BAT on activities taking place on the surface areas designated as Navajo partitioned land within the former JUA. 1987 amendments to the 1964 Navajo North lease, new Article XXXIV(b), at 15 (hereinafter Amended 1964 Navajo North lease); 1987 amendments to the 1966 Navajo JUA lease, new Article XXXI(b), at 15 (hereinafter Amended 1966 Navajo JUA lease). However, the taxation provisions contain identical abatement clauses, which state that Peabody, Black Mesa Pipeline, Inc., the Black Mesa and Lake Powell Railroad, and the Navajo and Mohave Participants are not liable for any taxes based upon ownership, operations or leasehold or other interest during periods prior to January 1, 1985. *See* Amended 1964 Navajo North lease, new Article XXXIV(d), at 17; Amended 1966 Navajo JUA lease, new Article XXXI(d), at 17.

The 1987 amendments to both the 1964 Navajo North lease and the 1966 Navajo JUA lease also expressly confirm the tax waiver provisions of the 1969 NGS lease which stated that the Navajo Nation would not tax or assess the NGS power plant, the NGS lease participants, the coal supplied to the power plant, or other property associated with the power plant. *See* Amended 1964 Navajo North lease, new Article XXXIV(a), at 13–14; Amended 1966 Navajo JUA lease, new Article XXXI(a), at 14.

## C. PROCEDURAL BACKGROUND

This action was filed in 1988 by Peabody and Edison (collectively, the "plaintiffs") against the defendant, Navajo Nation, and was originally assigned to The Honorable Roger G. Strand. In their amended complaint, the plaintiffs sought a declaration of the Navajo Nation's authority to impose the PIT on Peabody's leasehold interests. The plaintiffs alleged that the PIT was preempted by federal law because it lacked approval

of both the Secretary of the Interior and the Hopi Tribe, in contravention of Section 7 of the Settlement Act. On November 3, 1988, the Hopi Tribe moved to intervene and filed a cross-claim against the Navajo Nation. The cross-claim alleged that the Hopi Tribe was entitled to one-half of all monies and the value of any other economic benefits the Navajo Nation derives from its imposition of, or forbearance from imposing, the PIT, the BAT, or any other tax on the subsurface mineral estate of, or mining operations within, the former JUA. On April 20, 1989, the motion to intervene was granted.

On February 12, 1990, the plaintiffs filed a motion for summary judgment. The Hopi Tribe subsequently filed its own motion for summary judgment. The Hopi's motion consisted of two claims—a "sovereignty" claim and an alternative "proceeds" claim. The sovereignty claim alleged that both the PIT and the BAT were invalid as levied against Peabody because they impermissibly interfered with the Hopi Tribe's joint sovereignty over the entire subsurface of the former JUA. The proceeds claim alleged that the Navajo Nation's PIT and BAT were mineral proceeds for purposes of the Settlement Act, subject to the share requirement of Section 7 of the Act.

On June 4, 1990, Judge Strand denied the plaintiffs' motion. With respect to the Hopi Tribe's motion, he ruled (1) that only the Navajo Nation has sovereignty over the subsurface of the Navajo partitioned land, and (2) that the Hopis and the Navajos must share equally in any economic benefit derived from the coal, including taxes. Commenting on Section 7 of the Settlement Act, Judge Strand stated, in part:

> That is a unique congressional statutory provision. And it imposes and intrudes upon the manner in which the Navajo and the Hopi Indian Tribes must conduct their affairs. The taxes imposed and/or waived by the Navajo Nation are lawful and valid in all respects except as applied to the extent that such imposition and/or waiver of taxes may impose upon the ability of the two tribes, the Navajo and the Hopi, to in fact share equally in the economic benefit to be derived from the coal.

Transcript of June 4, 1990 proceedings before The Honorable Roger G. Strand at 44. The Hopi Tribe and the Navajo Nation were then ordered to submit a plan for the equitable management of the coal reserves.

On December 10, 1990, a hearing was held to consider the Hopi's and the Navajo's positions on the proposed management plan. At that hearing, Judge Strand commented on, and clarified his June 4, 1990 ruling, in part, as follows:

> [I]t is clear that to the extent the tax represents a direct relation to the value of the mineral in place, that that needs to be shared. And by ... so ordering, the Court is not imposing upon any sovereign right of either tribe to tax as it sees fit. It's just that to the extent Congress has directed that the proceeds therefrom shall be divided ... there may be the necessity to share what otherwise would be regarded as one nation or the other's sole tax proceeds.

Transcript of December 10, 1990 proceedings before The Honorable Roger G. Strand at 21.

On August 14, 1991, the Hopi Tribe filed a second motion for summary judgment on its proceeds claim, arguing that the benefits accruing to the Navajo Nation as a result of the PIT and BAT, whether imposed or waived, are in fact mineral proceeds which must be shared with the Hopis. The Navajos responded that the revenues generated from the PIT and BAT are not mineral proceeds for purposes of the Settlement Act, but rather are derived from the legitimate exercise of governmental authority over economic activity on Navajo partitioned land. On June 2, 1993, Judge Strand denied the Hopi Tribe's second motion for summary judgment but commented, in part:

> The Navajo Tribe continues to dispute the Court's earlier ruling that the PIT and BAT taxes are proceeds under the statute and seeks to have the Court construe "proceeds" to mean "compensation received in exchange for the conveyance of a tribe's property right in minerals" and no more. The Navajos have offered no new facts or law that should cause the Court to modify its prior construction. It is appropriate for the Hopi Tribe to "share and share

alike" in the various taxes imposed by the Navajo Nation. If the Navajos dispute that the taxes received or waived are derived solely from the value of minerals in place as opposed to economic activity on the surface of the Navajo reservation, the Navajos must come forward with evidence.

As noted above, the Court already has found that the economic benefit derived to the taxing entity by virtue of the coal that underlies the land must be shared.

. . . .

... The Court has stated on two occasions that taxes are proceeds subject to an equitable division under the statute . . . .

... [T]here is a genuine issue of material fact concerning the value of benefits derived from the coal. Although the Court is unwilling to grant summary judgment on the evidence presented thus far, the Navajo Tribe is cautioned that it must bring forward evidence to demonstrate that the BAT and PIT rely on coal value only to a limited extent or that the BAT revenue does not provide economic value by virtue of the coal that underlies the land.

Order of The Honorable Roger G. Strand of June 2, 1993 at 5–8.

On July 16, 1993, the plaintiffs moved for entry of a final judgment on the sovereignty claim pursuant to Rule 54(b) of the Federal Rules of Civil Procedure so that an appeal, if any, could be taken. In February, 1994, this case was transferred to The Honorable Bruce M. Van Sickle. Judge Strand did, however, enter a final judgment under Rule 54(b) on March 2, 1994, thus terminating Peabody's and Edison's involvement in this case. The Hopi Tribe thereafter filed a notice of appeal from the final judgment on the sovereignty claim.[3]

The proceeds claim was tried to this court, Judge Van Sickle presiding. Pursuant to Judge Strand's June 2, 1993 Order, the Hopi Tribe, in their case-in-chief, presented evidence of back taxes assessed upon Peabody or waived by the Navajos and then rested. The Navajo Nation responded with evidence that the relationship between the taxes and the coal is remote and that the Navajos are burdened by governmental costs associated with Peabody's operation of coal mines on Navajo partitioned land which may be offset against any mineral proceeds. In addition, the Navajos introduced evidence supporting the affirmative defenses of waiver, estoppel, and laches. In its reply case, the Hopi Tribe argued that it was entitled to one-half of the value of PIT and BAT revenues relinquished via the Navajo Nation's tax abatements and waivers because in exchange for the abatements and waivers, the Navajos received benefits under the terms of the amended leases which were at least equal to the foregone tax revenues.[4]

## II. CONCLUSIONS OF LAW

█ The primary issue before this court is whether PIT and BAT revenues are properly considered mineral "proceeds" for purposes of Section 7 of the Settlement Act, which provides:

Partition of the surface of the lands of the joint use area shall not affect the joint ownership status of the coal, oil, gas, and all other minerals within or underlying such lands. All such coal, oil, gas, and other minerals within or underlying such lands shall be managed jointly by the two tribes, subject to supervision and approval by the secretary as otherwise required by law, and the proceeds therefrom shall be divided between the tribes, share and share alike.

25 U.S.C. § 640d–6.

█ Judge Strand has ruled that to the extent the PIT and BAT are related to the jointly owned coal, they are mineral proceeds

---

**3.** The Hopi Tribe has requested a postponement of briefing to the United States Court of Appeals for the Ninth Circuit until a final judgment has been rendered in this case so that any appeal from these proceedings can be consolidated with the sovereignty claim appeal.

**4.** The Hopi Tribe does not claim an interest in the benefits received by the Navajo Nation under the amended leases. Evidence regarding benefits received in lieu of taxes was offered only as rebuttal evidence in response to the Navajo argument that the tax abatements and waivers had insufficient consideration. *See* Trial Tr. (5/3/94) at 33.

which must be shared pursuant to Section 7 of the Settlement Act. Under the "law of the case" doctrine, in the interest of finality, economy, and the prevention of repetitious litigation, prior rulings in the same case are generally not revisited. *See United States v. Miller*, 812 F.2d 543, 547 (9th Cir.1987). However, the doctrine expresses a rule of practice and not a limit on authority; courts retain the discretion to reconsider prior rulings. *See id.* After a review of the totality of the evidence in this case, this court, mindful of the purpose of the "law of the case" doctrine and with due respect to Judge Strand, herein reconsiders the prior rulings regarding whether the PIT and BAT qualify as mineral proceeds.

■ The determination of whether the PIT and BAT are mineral proceeds must necessarily begin with the definition of the term "proceeds." The word is not defined in the Settlement Act. A fundamental canon of statutory construction is that, "unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979). In determining the common understanding of a word, courts often refer to dictionary definitions. *See, e.g., Chapman v. United States*, 500 U.S. 453, 462, 111 S.Ct. 1919, 1925, 114 L.Ed.2d 524 (1991). A review of various dictionary definitions of the word "proceeds"[5] reveals that although

there is no single meaning which can be assigned to the word, a common theme found in all definitions is that proceeds are value arising from a commercial transaction, such as "the money or profit derived from a sale, business venture, etc." Webster's New World Dictionary 1072 (Third College Ed. 1988). The Navajo Nation acts as a commercial partner when it sells its right to use or exploit jointly owned minerals, but it acts as a sovereign when it imposes taxes on economic activities within its jurisdiction. *See Kerr–McGee v. Navajo Tribe of Indians*, 471 U.S. 195, 200, 105 S.Ct. 1900, 1903, 85 L.Ed.2d 200 (1985). Given that tax revenues are not derived from commercial transactions, they would not fit under the common definition of proceeds.

There are, however, a few alternative dictionary definitions of the word "proceeds" which are broad enough to include any derivative, such as "that which results or accrues." The Random House Dictionary of the English Language Unabridged 1147 (1970). To the extent that the PIT and BAT are economic benefits which have a "but-for" relationship with the jointly owned coal, they would qualify as proceeds under such a broad definition. The existence of alternative dictionary definitions of the word "proceeds," each arguably making some sense under Section 7 of the Settlement Act, indicates that the statute is open to further interpretation.

---

**5.** Black's Law Dictionary defines "proceeds" as follows:

> Issues; income; yield; receipts; produce; money or articles or other thing of value arising or obtained by the sale of property; the sum, amount, or value of property sold or converted into money or into other property.... That which results, proceeds, or accrues from some possession or transaction.... The funds received from disposition of assets or from the issue of securities (after deduction of all costs and fees). As used in context of debtor's sale of collateral, "proceeds" includes whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds. Insurance payable by reason of loss or damage to the collateral is proceeds, except to the extent that it is payable to a person other than a party to the security agreement....

Black's Law Dictionary 1204–05 (6th Ed.1990) (citations omitted). Webster's Third New International Dictionary Unabridged defines "proceeds" as,

> what is produced by or derived from something (as a sale, investment, levy, business) by way of total revenue[.] [T]he total amount brought in.... [T]he net profit made on something.... [T]he net sum received (as for a check, a negotiable note, an insurance policy) after deduction of any discount or charges[.]

Webster's Third New International Dictionary Unabridged 1807 (1986).

Some other dictionary definitions of the word "proceeds" are as follows: "[T]hat which results or accrues. [T]he total sum derived from a sale or other transaction.... [T]he profits or returns from a sale, investment, etc." The Random House Dictionary of the English Language Unabridged 1147 (1970). "The amount of money derived from a commercial or fund-raising venture; yield." The American Heritage Dictionary 987 (Second College Ed. 1885). "[T]he money or profit derived from a sale, business venture, etc." Webster's New World Dictionary 1072 (Third College Ed.1988).

*National R.R. Passenger Corp. v. Boston & Maine Corp.,* —— U.S. ——, ——, 112 S.Ct. 1394, 1402, 118 L.Ed.2d 52 (1992).

■ In determining which definition of proceeds to apply, this court first considers the legislative purpose of Section 7 of the Settlement Act. Regarding Section 7, a report of the Senate Committee on Interior and Insular Affairs states, "Section 7 preserves the joint ownership by both tribes of coal, oil, gas and other minerals within and underlying the joint use area." S.Rep. No. 93–1177, 93d Cong., 2d Sess. 21 (1974). This intention is reflected in the first sentence of Section 7, which states that the partition of the surface of the former JUA does not affect the joint ownership status of the subsurface mineral estate. 25 U.S.C. § 640d–6. There is nothing in the plain language of Section 7 which suggests that Congress thought the tribes should equalize all economic consequences stemming from the jointly owned coal. Based on the record and the clear language of the statute, this court concludes that the legislative purpose of Section 7 of the Settlement Act was simply to preserve the joint ownership by both the Hopis and the Navajos of the mineral estate within and underlying the former JUA.

The preservation of the joint ownership of the mineral estate certainly requires the Hopis and the Navajos to share any royalty payments made in exchange for the disposition or use of jointly owned minerals, a requirement which would be reflected in the common definition of proceeds as the value derived from a commercial transaction. It does not, however, require an absolute equalization of all economic consequences (including taxes) which have a "but-for" relationship with the jointly owned minerals, a requirement which would be reflected in a broad definition of proceeds as any mineral derivative. Therefore, this court concludes that the common definition of "proceeds" as value arising from a commercial transaction is more consistent with the legislative purpose of Section 7 of the Settlement Act than is a broader definition.

■ Another fundamental canon of statutory interpretation is that statutes should not be read to create "absurd results." *See, e.g., Trans Alaska Pipeline Rate Cases,* 436 U.S. 631, 643, 98 S.Ct. 2053, 2061, 56 L.Ed.2d 591 (1978). To define "proceeds" in such a way that the tribes would be required to equalize all economic effects having their origin in the jointly owned minerals would create an unworkable arrangement. The tribes would be required to share both the positive and the negative economic effects stemming from the jointly owned minerals, a requirement which would necessitate an annual accounting proceeding to equalize the economic impact of all businesses, taxes, and government outlays which might somehow be related to the jointly owned subsurface mineral estate. Such an accounting would spawn excessive litigation, would be inconsistent with each tribe's national sovereignty, and would likely be beyond judicial competence. Therefore, the consequences of a broad definition of proceeds lead this court to conclude that it could not have been intended by Congress.

### III. CONCLUSION

■ The obligation to share mineral proceeds under Section 7 of the Settlement Act is limited to payments made in exchange for rights to use or exploit jointly owned minerals. It is therefore the conclusion of this court that PIT and BAT revenues do not qualify as "proceeds" for purposes of the Act. Implicit in this conclusion is the finding that the PIT and BAT are not mere substitutes for royalty payments.[6]

Because this court concludes that the issue of whether PIT and BAT revenues are mineral proceeds is determinative of this matter, no opinion is expressed as to the degree of relatedness between the taxes and the jointly owned coal, the governmental costs imposed on the Navajo Nation by virtue of the fact that the coal mines are on its land, the value of benefits received by the Navajos in lieu of taxes, or the affirmative defenses of waiver, estoppel, and laches.

6. *See* Trial Tr. (3/18/94) at 78–88 (testimony of Walter Hellerstein).

LET JUDGMENT BE ENTERED AC-
CORDINGLY.