**The HOPI TRIBE, Plaintiff,**

v.

**James G. WATT, Secretary of the Interior, and The United States Department of the Interior, Defendants,**

**and**

**The Navajo Tribe, Defendant-Intervenor.**

**No. CIV 81–272 PCT–EHC.**

United States District Court,
D. Arizona.

Jan. 21, 1982.

Stephen G. Boyden, Boyden Kennedy & Romney, John Paul Kennedy, Scott C. Pugsley, Richard M. Hymas, Salt Lake City, Utah, for plaintiff.

Richard S. Allemann, Asst. U. S. Atty., Phoenix, Ariz., Steven E. Carroll, Dept. of Justice, Land & Natural Resources Division, Washington, D. C., for defendants.

George P. Vlassis, Vlassis & Ott, Phoenix, Ariz., for defendant-intervenor The Navajo Tribe.

## MEMORANDUM AND ORDER

CARROLL, District Judge.

Plaintiff Hopi Tribe brought this action against James G. Watt, Secretary of the Interior, and the United States Department of the Interior for declaratory and injunctive relief. Specifically, the Hopi Tribe seeks an order of this Court which would declare void and invalid a portion of Secretarial Order No. 3057, signed by the Secretary of the Interior on October 9, 1980. The challenged portion requires the Interior Department and the Bureau of Indian Affairs to administer grazing and range restoration matters on Hopi partitioned area of the former Joint Use Area in accordance with 25 C.F.R. Parts 12 and 153. The Hopis contend that to the extent that the Secretarial Order establishes or continues procedures for conservation practices on Hopi partitioned lands without coordinating with and obtaining the concurrence of the Hopi Tribe, such order violates Section 3 of the Navajo-Hopi Indian Relocation Amendments Act of 1980, P.L. 96–305, 94 Stat. 929, codified as a part of 25 U.S.C. § 640d et seq. (hereafter "1980 Amendments Act").

The Navajo Tribe sought intervention in order to protect the interests of its tribal members who presently live on the Hopi portion of the partitioned Joint Use Area. On June 8, 1981, the Court granted the Navajo's April 8, 1981, motion to intervene.

On May 21, 1981, plaintiff filed a motion for summary judgment, which was opposed by the defendants and the Navajo Tribe.

Oral arguments on the summary judgment motion and the evidentiary hearing on the preliminary injunction motion were held on June 19, 1981, and both motions were taken under advisement.

The following discussion will assist in understanding the issues before the Court.

## I. FACTUAL BACKGROUND

In 1974 Congress enacted legislation intended to provide for the settlement of the Navajo-Hopi dispute concerning the Joint Use Area, comprised of approximately 2,000,000 acres of reservation lands located in Northeastern Arizona. See Navajo-Hopi Settlement Act of December 22, 1974, P.L. 93–531, 88 Stat. 1712, 25 U.S.C. 640d et seq. [hereafter "1974 Settlement Act"]. The 1974 Settlement Act provided for court partition of the disputed land and for the eventual relocation of over 800 Indian families most of whom were Navajos. The partition of the Joint Use Area and the relocation of displaced Indian families was intended to ultimately make each tribe autonomous with respect to their reservation lands.

Following the passage of this act, and entry of the Court's Judgment of Partition in February, 1977, regulations were promulgated in 1977 by the Secretary of the Interior. Specifically, 25 C.F.R. Part 153, sets forth grazing regulations for the former Navajo-Hopi Joint Use Area (JUA) lands. A Project Officer of the Bureau of Indian Affairs, Administrative Office at Flagstaff, Arizona (BIA) was delegated specific responsibilities for issuance of grazing permits to persons in the JUA awaiting relocation. 25 C.F.R. Part 12 was captioned "Code of Offenses for Navajo-Hopi Settlement Act Secretarial Responsibilities". Regulations embodied in Part 12 set up a code of offenses for various acts occurring in the former JUA, as well as a court and jury system—with jurors who were residents of the JUA—to try such offenses.

Both tribes were dissatisfied with provisions of the 1974 Act, and each attempted to obtain congressional amendments favorable to their respective interests. In 1980, the Senate and the House each passed bills to amend the 1974 Act.

The House made certain amendments to the Senate bill (S.751), and after the Senate failed to concur in such amendments, a Committee of Conference of both bodies met and ultimately submitted a conference

report (H.Rep. No. 96–1094). The Committee recommended certain amendments to the 1974 Act—to be cited as the "Navajo and Hopi Indian Relocation Amendments Act of 1980." Cong.Rec. Vol. 126, H. 5045–5048.

The Conference Report on S. 751, was a compromise between the Senate and House bills. One of the conferees stated that "the initial Senate and House versions of these amendments could be fairly described as pro-Navajo and pro-Hopi, respectively". Cong.Rec. Vol. 126, H. 5661. The process of amalgamating these two philosophies into S–751 underlies the dispute now before this Court.

Prior to the 1980 Amendments Act, the 1974 Act, 25 U.S.C. § 640d–18(a) "authorized and directed" the Secretary:

> ... to immediately commence reduction of the numbers of all the livestock now being grazed upon the lands within the joint use area and complete such reductions to carrying capacity of such lands, as determined by the usual range capacity standards as established by the Secretary after December 22, 1974. The Secretary is directed to institute such conservation practices and methods within such area as are necessary to restore the grazing potential of such area to the maximum extent possible.

See in this regard, *Sekaquaptewa v. Mac-Donald*, 544 F.2d 396 (9th Cir. 1976).

Section 640d–18(b) also directed the Secretary upon issuance of the partition order for the joint use lands (entered February 10, 1977 in Cause No. Civ. 759 PCT–JAW) to "provide for the survey location of monuments, and fencing of boundaries of any lands partitioned".

## 1980 AMENDMENTS ACT

Section 3 of the 1980 Amendments Act, codified at 25 U.S.C. § 640d–9(c)–(f), provides in pertinent part as follows:

> (c) The Secretary shall take such action as may be necessary in order to assure the protection, until relocation, of the rights and property of individuals subject to relocation, pursuant to this act, or any judgment of partition pursuant thereto, including any individual authorized to reside on land covered by a life estate conferred pursuant to section 30 of this act.
>
> (d) With respect to any individual subject to relocation, the Secretary shall take such action as may be necessary to assure that such individuals are not deprived of benefits or services by reason of their status as an individual subject to relocation.
>
> (e)(1) Lands partitioned pursuant to this Act, ... shall be subject to the jurisdiction of the tribe to whom partitioned and the laws of such tribe shall apply to such partitioned lands under the following schedule:
>
> (A) Effective ninety days after enactment of this subsection, [July 8, 1980] all conservation practices, including grazing control and range restoration activities, shall be coordinated and executed with the concurrence of the tribe to whom the particular lands in question have been partitioned, and all such grazing and range restoration matters on the ... Hopi Reservation lands [shall be administered] by the Bureau of Indian Affairs Phoenix Area Office, under applicable laws and regulations.
>
> (B) Notwithstanding any provision of law to the contrary, each tribe shall have such jurisdiction and authority over any lands partitioned to it and all persons located thereon, not in conflict with the laws and regulations referred to in paragraph (A) above, to the same extent as is applicable to those other portions of its reservation. Such jurisdiction and authority over partitioned lands shall become effective April 18, 1981.
>
> The provisions of the subsection shall be subject to the responsibility of the Secretary to protect the rights and property of life tenants and persons awaiting relocation as provided in subsections (c) and (d) of this section.

The 1980 Act did not amend § 640d–18(a) and (b) which concerned the Secretary's authorization to undertake certain activities in the JUA. Rather, the 1980 Act added sub-

section (c) to section 18. This subsection required the Secretary to complete the surveying, monumenting, fencing operations, and livestock reduction program authorized under (a) and (b), by certain dates. Specifically, subsection (c) provides as follows:

(c)(1) Surveying, monumenting, and fencing as required by subsection (b) of this section shall be completed within twelve months after July 8, 1980, with respect to lands partitioned pursuant to section 640d–3 of this title and within twelve months after a final order of partition with respect to any lands partitioned pursuant to section 640d–7 of this title.

(2) The livestock reduction program required under subsection (a) of this section shall be completed within eighteen months after July 8, 1980.

The 1980 Amendments Act changed and liberalized the life estate provisions for Navajos on Hopi partitioned land, as well as authorized additional land to be acquired by the Navajos from the Bureau of Land Management (BLM) and by purchase of private lands.

## CONTENTIONS OF THE PARTIES

*The Hopi Tribe*—The Hopis contend that the 1980 Amendments Act precludes the Secretary:

... from implementing any conservation practice, including grazing control and range restoration activities, on any and all parts of the Hopi partitioned area without first coordinating with and obtaining the concurrence of the Hopi Tribe as to the appropriateness of such conservation practices, ...

Hopi Complaint, page 7.

The Hopis contend that effective April 18, 1981, tribal concurrence is required for impoundment and fencing activities and issuance of grazing permits to Navajos eligible for relocation, i.e., "... any regulation that the Secretary proposes to adopt following April 6th has to be concurred in by the Hopi Tribe".

(Tr. 21–22) *

---

* Transcript references are to the June 19, 1981,

The Hopis argue that the Secretary has been placed in what they term a "reactive" role. In other words, the only time the Secretary can act is when he considers it necessary to protect the rights and property of the Navajo relocatees.

*The Secretary*—The Secretary's position as stated variously at the June 19, 1981, hearing is that the 1980 Act mandates "an effort to consult with the Hopi Tribe and to gain as much concurrence as possible so as to manage those lands that Navajos are presently occupying until those Navajos are relocated".

(Tr. 35)

The Secretary argues that the only jurisdiction transferred to the Hopi Tribe was that not inconsistent with "applicable laws and regulations". The Secretary contends that the "applicable laws and regulations", include 25 C.F.R. Parts 12 and 153, as well as prior orders in Cause No. Civ. 759 PCT–JAW, and that they "entirely fill the field". Thus, the Secretary concludes that the Hopis didn't acquire any jurisdiction over "grazing and related matters". This position was summarized by the Secretary's counsel as follows:

I think the Congress gave with one hand and took it way with the other and in effect transferred no jurisdiction to the Hopi Tribe.

(Tr. 42)

*The Navajo Tribe*—The Tribe notes the obvious—that the 1980 Act:

... is an unusual piece of legislation, and it is a piece of legislation that contains so many compromises of one sort or another that the finished product is indeed a difficult piece of legislation to be able to follow.

(Tr. 49)

The Navajos do suggest that:

On matters that do not affect the rights and property of the Navajo relocatees, it might be fair to say that the Hopis do have some right of concurrence, but with respect to those matters that are

proceeding.

of concern on a subsistence, or a vital level to the Navajo relocatees, that duty with respect to the Hopi concurrence or veto simply isn't there.

(Tr. 51)

The Navajo's counsel characterizes that part of Section 3 of the 1980 Amendments Act codified as § 640d–9(e)(1)(A) as "legislative pap". A "kind of hopeful compromise that would not have much meaning and would not make either tribe feel they had been disadvantaged". (Tr. 55–56)

In summary, the Navajos find no grant of jurisdiction to the Hopis regarding partitioned lands which would in any way impact on the Navajos, either as to conservation matters or law and order.

### LEGISLATIVE HISTORY

The first place to seek enlightenment as to the meaning of any legislative enactment is the reported record of its progress through the Senate and House, i.e., what was said by members of Congress, or other interested parties, that would clarify confusion or resolve ambiguities.

The Joint Explanatory Statement of the Committee of Conference for what became the 1980 Amendments Act appears in the Congressional Record of June 17, 1980, Vol. 126, H5047–5048. With reference to Section 3 of S–751 (25 U.S.C. § 640d–9(c)–(f), the report states:

### OTHER SIGNIFICANT ISSUES

Section 3 of the conference report adopts language of the Senate-passed bill providing that the Secretary must protect the rights and benefits of life tenants and persons awaiting relocation. This provision is patterned after an order of the Federal district court directing the Secretary to afford such protection. It is not intended by this provision that any new rights of the Secretary be created to interfere with the jurisdictional rights of the tribes, but it is designed to insure the safety and well-being of life estate tenants and persons awaiting relocation under the 1974 Act. For instance, if a tribe carries out its law and order functions in a manner that is patently unfair to life tenants or relocatees, the Secretary will have an obligation to take steps to prevent that action. However, the provision does not empower the Secretary to ignore applicable laws, court orders, regulations or ordinances or to offer any basis for delaying relocation according to the Act.

In addition, section 3 provides for the complete assumption of jurisdiction over the partitioned lands by the tribe to whom partitioned no later than April 18, 1981. While there is some ambiguity about the existing state of the law in this respect, this provision makes clear that the complete jurisdiction of the relevant tribe will be in effect on that date. However, such jurisdiction will be subject to the responsibility of the Secretary, under the 1974 Act, for conservation practices on the former joint use area lands and will also be subject to the responsibility of the Secretary to protect the rights and benefits of persons awaiting relocation and of life tenants.

The conference report does not contain the section 9 provision of the House-passed bill authorizing the tribes to contract to carry out the conservation, range restoration, or reclamation functions of the Secretary on the partitioned lands. While this section was dropped because the conference committee was advised that sufficient authority for these purposes exists under Public Law 93–638, the conferees urge the Secretary to exercise such authority to the greatest extent feasible to provide employment for tribal members in carrying out conservation, range restoration, and reclamation functions, including the drilling of wells, in the partitioned area.

When the Conference Report on S.571 was called up in the House on June 25, 1980, Remarks by Congressman Dan Marriott, one of the conferees, made reference to sections 3 and 8 (Congressional Record of June 25, 1980, Vol. 126, H. 5663):

Section 3 provides very important language regarding tribal jurisdiction over the partition lands. Much of the frustra-

tion experienced by the Hopis has involved this issue. Outright interference by the Bureau of Indian Affairs over Hopi use and control of their partitioned lands has required these specific provisions which establish deadlines for assumption of full jurisdiction by the Hopi Tribe. The Secretary is charged with the responsibility to safeguard relocatees and life-estate tenants. But that responsibility is only meant to correct any cases of Hopi harassment (which have never yet occurred). It is ironic that this provision was included because history has shown that all the harassment has come from the Navajos with virtually no action by the Secretary to protect the Hopis.

Nonetheless, this provision resolves some of the hitherto unfounded Navajo fears and may, indeed, also work for the protection of the Hopis. The provision is not designed to give the Secretary of the Interior any powers to prevent the Hopis from obtaining the full and complete peaceful enjoyment of their restored lands. If the Secretary and/or Commission is unable to carry out its assignments, then it is essential that the Tribes have this full jurisdiction to make certain themselves that the relocation is accomplished within the statutory deadline.

\* \* \* \* \* \*

Section 8 establishes final deadlines for the Secretary to accomplish surveying, monumenting, fencing and livestock reduction before the respective tribes take over these tasks. The Secretary's past failures in these areas are not condoned in any way by the amendments but it was felt that specific Congressional deadlines would encourage compliance with existing court orders in these areas and set dates on which the Tribes may take over these jobs.

Report No. 96–544, dated October 23, 1979, is the report of the House Committee on Interior and Insular Affairs having to do with H.R. 5262, amending the 1974 Act. This report has some relevance since certain of the House proposals found their way into the 1980 Amendments Act.

H.R. 5262 proposed an amendment to Section 10 of the 1974 Act (25 U.S.C. § 640d–9) to read as follows:

(c) Lands partitioned pursuant to this Act, whether by interim or final order of the court, shall be subject to the jurisdiction of the tribe to whom partitioned and the laws of such tribe, regulating land use, shall apply to such partitioned lands, except as may be otherwise provided in sections 12(a) and 31 of this Act, as amended.

The Committee analysis of this proposal (p.5) is not helpful, since it essentially restates the language of the amendment:

Section 3 provides that each tribe shall have normal tribal jurisdiction over partitioned lands and that land use ordinances shall apply to lands so partitioned, except as may be limited by sections 13 and 31 of the Act, as amended. . . .

Section 13 of the 1974 Act was codified as 25 U.S.C. § 640d–12. Section 31 was a proposed amendment under H.R. 5262 and would have expanded the authority for granting life estates to families who are required to relocate.

H.R. 5262, also proposed amendments to Section 19 of the 1974 Act (25 U.S.C. § 640d–18):

(c)(1) Conservation practices, including grazing control and range restoration activities in the joint use as required by subsection (a) of this section, shall be coordinated and executed with the concurrence of the tribe to whom the particular lands in question have been partitioned.

(2) Surveying, monumenting, and fencing as required by subsection (b) of this section shall be completed within twelve months after the date of enactment of this subsection with respect to lands partitioned pursuant to section 4 of this Act and within twelve months after a final order of partition with respect to any lands partitioned pursuant to section 8 of this Act.

(3) The livestock reduction program required under subsection (a) of this section

shall be completed within 18 months after the date of enactment of this subsection.

Again, the Committee analysis (p.7) does not clarify what was intended with respect to tribal participation in conservation matters:

Section 9 of the Committee recommended version of the bill adds language which provides:

(1) that various conservation practices and activities required by the Act on the partitioned lands shall be coordinated and executed by the Secretary with the concurrence of the appropriate tribe.

\* \* \* \* \* \*

(4) that the two tribes may contract with the Secretary to carry out conservation, range restoration or reclamation on partitioned lands or projects otherwise connected with the relocation plan.

The Report of the Senate Select Committee on Indian Affairs accompanying S. 751, 96th Congress, 1st Session, Report No. 96–373, October 15, 1979, stated, by way of explanation of proposed amendments:

*Protection of Individuals and Property in the JUA.*—Section 3 requires the Secretary to take whatever steps may be necessary to protect the rights and property of individuals subject to relocation. Testimony regarding the tensions that exist in the joint use area have caused some concern to the committee. The committee wants to be certain that the Department of the Interior responds promptly to complaints of violence, vandalism, or threats to life and property. The committee believes appropriate law enforcement must promptly protect the persons and property of individuals in the joint use area.

Testimony has also revealed that persons in the joint use area who are subject to relocation are not receiving the full array of services available to other individuals on either the Navajo or Hopi Reservations. Section 3 requires the Secretary to take steps to insure that all services be provided to those still residing in the joint use area, including, but not limited to, health, education, training, welfare and housing, including home heating services.

*Time Limits on Stock Reduction and Fencing.*—The original act contained no deadlines for stock reduction or fencing in the joint use area. However, because nearly 5 years have passed since the act was passed and these objectives have not been met, the Committee feels that a deadline must be set to insure timely completion of these projects. For surveying, monumenting and fencing, the committee believes that 12 months is a reasonable period in which to complete these tasks and section 11 therefore directs that they be completed within 12 months of enactment of this act. Similarly, 18 months is a reasonable time in which livestock reduction can be completed, as delays in reduction appear to be causing increased tension and animosity in the joint use area.

*Transfer of Grazing Control and Range Restoration to Area Offices.*—Since lands have now been partitioned by the courts to the tribes, the committee believes it will be in the best interests of the tribes and all concerned if responsibility for range restoration and grazing control be returned to the respective area offices for the two tribes. Section 11 will accomplish this result. Such responsibility shall include tribal concurrence on any and all decisions made as to the future of the newly partitioned land on matters of grazing and restoration. However, the land laws or grazing regulations of the respective tribes shall not be applicable to the individual life estates. This authority remains with the Department of the Interior.

The Department of the Interior, while presenting its views on S. 751, did not comment on the amendments discussed in the above excerpt from Report No. 96–373. (Executive Communication dated August 3, 1979).

A fair reading of the Joint Explanatory Statement of the Committee of Conference (H 5047) reveals that the 1980 Amendments Act was intended in part to remedy a per-

ceived "failure on the part of the executive branch to effectively carry out the terms of the [1974] Settlement Act."

With an optimism nurtured perhaps by our nation's more than 200 year history of legislation through compromise, the Committee of Conference expressed its "overall intent" (H 5047):

> Finally, it is the overall intent of the conference committee that the terms of the Settlement Act, as amended by S.751, be expeditiously and efficiently carried out, with a minimum amount of litigation and delay. Where there may be ambiguities in the terms of the Act, it is the intent of the committee that those ambiguities be construed in a manner that will achieve litigation-free, expeditious implementation of the Act and relocation of families.

The problem then is how to achieve these intentions within the parameters of the legislation under review.

## COURT JURISDICTION

### A. MOOTNESS

The stated purpose of Secretarial Order No. 3057, which order precipitated the filing of this action, was to transfer administrative jurisdiction and operational responsibilities over land partitioned to the Navajo and Hopi Tribes from the BIA's Flagstaff administrative office, to the BIA Phoenix Area Office for Hopi partitioned lands and to the BIA Navajo Area Office for lands partitioned to the Navajo Tribe.

> Section 3 of Order No. 3057 provided:
> *Procedures.* Actions taken by the Bureau of Indian Affairs affecting conservation practices on lands partitioned to the Hopi Tribe and the Navajo Tribe shall be coordinated and executed with the concurrence of the tribe to which the lands in question have been partitioned. *All grazing and range restoration matters shall be administered in accordance with 25 CFR Parts 12 and 153 and with any applicable statutes.* (Emphasis supplied)

The Hopis contended that the italicized portion of Section 3 conflicted with the provisions of the 1980 Amendments Act, 25 U.S.C. § 640d–9(e) and the complaint sought to enjoin any BIA actions undertaken pursuant to Parts 12 and 153 unless there was coordination with and concurrence of the Hopi Tribe.

Order No. 3057 was only to remain in effect until April 18, 1981. Accordingly, Defendants and Intervenor argue that assuming Order No. 3057 is an "order", "rule" or "agency action" for purposes of 5 U.S. C.A. §§ 701(b)(2), 702, or 551, the case should be dismissed for mootness, citing *Tennessee Gas Pipeline Co. v. Federal Power Comm.,* 606 F.2d 1373, 1379 (D.C.Cir. 1979).

Obviously, there must be a viable case or controversy to meet the requirements of Article III of the U.S. Constitution. *Tennessee Gas* recognizes however that termination of a particular order may not moot an issue which is continuing, or subject to repetition and which should be resolved in the public interest:

> Judicial review of administrative action, like all exercises of the federal judicial power, is circumscribed by the requirement that there be an actual controversy. Accordingly, we have no jurisdiction over suits challenging administrative orders which are moot. Concededly the concept of mootness is placed under strain in the context of administrative orders whose formal legal effect is typically shortlived. It would be perverse were the decision of important continuing controversies defeated, as it would be by an overnarrow application of the doctrine, in cases of 'short term orders, capable of repetition, yet evading review.' In fact, the law quite sensibly finds such cases justiciable, despite the fact that mootness, even in the constitutional sense, consequently appears more a discretionary exercise of judicial restraint than a bright line jurisdictional prerequisite. . . .

606 F.2d at 1379.

■ The underlying disputes between the Hopis, the Secretary and the Navajos go well beyond Order No. 3057 and April 18, 1981, and it is appropriate to address and

resolve—insofar as possible—these disputes. The matter is not moot.

### B. SOVEREIGN IMMUNITY

The Hopi complaint anticipated a continuance of the parties' divergent views as to the meanings of the 1980 amendments and sought a declaratory judgment that Section 3 of the 1980 Amendments Act (25 U.S.C. § 640d–9(c) through (f)) required the Secretary to coordinate and obtain the concurrence of the Hopi Tribe before "implementing *any* conservation practice, including grazing control and range restoration activities, *on any and all parts of the Hopi partitioned area.*" (Emphasis supplied)

The Secretary seeks shelter under the doctrine of sovereign immunity. The thrust of the Hopi's claim in this proceeding is not unlike that asserted by the plaintiff in *State of Washington v. Udall*, 417 F.2d 1310 (9th Cir. 1969), that the Secretary of the Interior is exceeding the authority delegated to him by Congress.

Although while perhaps not an express waiver of sovereign immunity, the 1980 Amendments Act, while noting its hope for an absence of further litigation, recognized the inevitability of such litigation (Section 29(a) of the Act, 25 U.S.C. § 640d–27):

> In any litigation or court action between or among the Hopi Tribe, the Navajo Tribe and the United States or any of its instrumentalities, arising out of the interpretation or implementation of this Act, as amended, the Secretary shall pay, subject to the availability of appropriations, attorneys' fees, costs and expenses as determined by the Secretary to be reasonable. . . .

■ I conclude that the doctrine of sovereign immunity does not deprive this Court of jurisdiction to review and construe the 1980 Amendments Act and to determine whether the Secretary has exceeded or is misconstruing the authority given him by that Act.

Having found the defense of sovereign immunity inapplicable, jurisdiction otherwise exists under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1361 (mandamus).

### ANALYSIS

There are two separate—but interrelated issues which must be addressed:

First, what effect did the enactment of 25 U.S.C. § 640d–9(e)(1)(A):

> Effective ninety days after July 8, 1980, all conservation practices, including grazing control and range restoration activities, shall be coordinated and executed with the concurrence of the tribe to whom the particular lands in question have been partitioned, and all such grazing and range restoration matters on the . . . Hopi Reservation lands [shall be administered] by the Bureau of Indian Affairs Phoenix Area Office, under applicable laws and regulations.

have with respect either to prior (or contemporaneous) grants of authority to the Secretary as to conservation related matters, or court orders outstanding in Cause No. CIV 795–PCT–JAW?

The second broad issue relates to Hopi Tribal law and order jurisdiction over partitioned lands after April 18, 1981.

### CONSERVATIONS FUNCTIONS

■ While there may be ambiguities in the provisions of § 640d–9(e)(1)(A), when such provisions are reviewed in light of other provisions in the 1974 Act, untouched by the 1980 amendments to § 640d–18, and legislative history, it is evident that the Secretary retained jurisdiction for specified times over reduction of livestock and surveying, monumenting and fencing the boundaries of partitioned lands.

In fact, subsections (c)(1) and (c)(2) were added to section 18, mandating that livestock reduction and surveying were to be completed by specific dates. Remarks by one of the Conferees noted that these amendments established "final deadlines for the Secretary to accomplish surveying, monumenting, fencing and livestock reduction before the respective tribes take over these tasks."

■ I find that the purpose of subsection 9(e)(1)(A) was to include the Hopi Tribe in any future planning and decisions, as to

"conservation practices, including grazing control and range restoration activities" on Hopi partitioned lands with the two exceptions noted. This conclusion is supported by the fact that this provision was proposed in both the Senate and House bills as an amendment to Section 18. There, it would have had obvious reference to that part of Section 18 which directed the Secretary to:

> ... institute such conservation practices and methods within such area as are necessary to restore the grazing potential of such area to the maximum extent possible.

That this was planning authority also finds support in the testimony of then Hopi Tribal Chairman Abbott Sekaquaptewa at the June 19, 1981, hearing:

> Well, we fought so hard and we negotiated for the right to have planning jurisdiction and to be able to have jurisdiction over the lands so that we can be able to do the things that I am talking about, and when we don't get that, and that was—that was the reason why planning jurisdiction was included in the 1980 amendment, as well as the transfer of—move the BIA jurisdiction from the Flagstaff office to Phoenix, because we were not given that opportunity by the Flagstaff office, and we—worked very hard during the negotiations meeting, negotiations meetings with Congressman Udall and so they were included in a bill and to be now denied that is, is a denial of our rights under the 1980 amendment.

(Tr. 115)

■ The 1980 Act does not identify how conservation practices "shall be coordinated and executed with the concurrence of the tribe". At a minimum, it requires meaningful opportunities for the tribe to know what practices or actions are proposed by the Secretary and to concur or not. If informal procedures were unavailing, the Secretary's planned conservation practices will have to be proposed in a formal way, with notice and hearing to the affected tribe. If the tribe does not concur, any implementation of such practice by the Secretary shall be limited to those situations where the Secretary expressly determines based upon findings of fact, that his intended action is necessary "to protect the rights and property of life tenants and persons awaiting relocation." Any such Secretarial determination shall be subject to review by this Court upon timely application of either tribe, and unless stayed by the Court shall be effective pending review.

The transfer of administrative responsibilities between BIA offices made necessary by the 1980 Amendments Act did not constitute a "conservation practice". Tribal concurrence was not required before Secretarial Order No. 3057 issued to effectuate this directive from Congress. Similarly, Secretarial Order No. 3057 did not constitute a readoption of 25 C.F.R. Parts 12 and 153. Whether these regulations have continued validity after October 9, 1980 or April 18, 1981, is not dependent on their inclusion in Order No. 3057.

One of the exceptions noted above to the Hopi planning power concerns the Secretary's duties with respect to livestock reduction. In this regard, it has been previously determined in Civ. 579 (Judgment of Partition entered February 10, 1977):

> The Secretary's jurisdiction and duties in the matter of livestock reduction and range restoration carry with them the implied power to control grazing within the Joint Use Area until he has complied with the provisions of Section 19(a) of the Act.

Inasmuch as the 1980 Amendments Act expressly requires continued Secretarial action to complete livestock reduction on or before January 8, 1982, I find that 25 C.F.R. Part 153 is an "applicable" regulation and may be utilized by the Secretary until January 8, 1982, to issue grazing permits to Navajos awaiting relocation. Thereafter Part 153 will no longer be an applicable regulation since its utilization would thwart powers granted to the Hopi Tribe by the 1980 Amendments Act. Any grazing permits issued by the Secretary will be effective until the termination date in the permit, not to exceed one year from date of issuance.

It should be remembered that lands in the former Joint Use Area were partitioned to each tribe. Any discussions as to impact of the 1980 Amendments Act on Hopi partitioned lands applies as well to Navajo partitioned lands.

LAW AND ORDER RESPONSIBILITIES—POST APRIL 18, 1981

Although the June 18, 1981 proceedings did not directly involve a law and order jurisdictional problem, I have concluded that something needs to be said in this memorandum about the jurisdiction issue.

The evident intention of the 1980 Amendments Act was to give each tribe more extensive jurisdiction over partitioned lands than provided under the 1974 Act. Thus § 640d–9(e)(1)(B) stated:

B. Notwithstanding any provision of law to the contrary, each tribe shall have such jurisdiction and authority over any lands partitioned to it and all persons located thereon, not in conflict with the laws and regulations referred to in paragraph A above [applicable laws and regulations], to the same extent as is applicable to those portions of its reservation. Such jurisdiction and authority over partitioned lands shall become effective April 18, 1981.

The provisions of the subsection shall be subject to the responsibility of the Secretary to protect the rights and property of life tenants and persons awaiting relocation as provided in subsection (c) and (d) of this section.

The legislative history of the 1980 Act supports the conclusion that the Act provided for "the complete assumption of jurisdiction over the partitioned lands by the tribe to whom partitioned no later than April 18, 1981." The Conference Committee report recognized that there "is some ambiguity about the existing state of law in this regard" and section 3 of the 1980 Act was to "make clear that the complete jurisdiction of the relevant tribe will be in effect on that date", subject to the oft-stated "responsibility of the Secretary to protect the rights and benefits of persons awaiting relocation and of life tenants."

It is difficult to understand the positions of the Government and the Navajo Tribe that everything remained status quo ante— and that the Hopis gained nothing by the 1980 Act. This would certainly come as a surprise to Representative-Conferee Marriott who opined in the Congressional Record (H 5662):

. . . As one of the conferees, I am pleased to state my belief that the product of the conference is fair to both tribes, balanced and workable. As is true of many good compromises, no party will receive all it sought in negotiations, *nor will any party fail to benefit from the outcome.* . . . (Emphasis supplied)

As to law and order responsibilities, the Secretary has a reactive posture. In explaining section 3 of the Act the Joint Explanatory Statement of the Committee of Conference provided (H 5048):

Section 3 of the conference report adopts language of the Senate-passed bill providing that the Secretary must protect the rights and benefits of life tenants and persons awaiting relocation. This provision is patterned after an order of the Federal district court directing the Secretary to afford such protection. It is not intended by this provision that any new rights of the Secretary be created to interfere with the jurisdictional rights of the tribe, but it is designed to insure the safety and well-being of life estate tenants and persons awaiting relocation under the 1974 Act. *For instance, if a tribe carries out its law and order functions in a manner that is patently unfair to the life tenants or relocatees, the Secretary will have an obligation to take steps to prevent that action.* . . . (Emphasis supplied)

Congressman Marriott's statement in support of what became section 3 of the 1980 Amendments Act, expresses this same understanding (H5663):

. . . The Secretary is charged with the responsibility to safeguard relocatees and life estate tenants. But that responsibility is only meant to correct any cases of Hopi harassment. . . .

What then is the effect of section 3 on 25 C.F.R., Part 12?

Part 12 is entitled "Code of Offenses for Navajo-Hopi Settlement Act Secretarial Responsibilities". The various crimes listed in Subpart M of the Code are not limited to livestock reduction or grazing control, but include, amongst other offenses, assault, extortion, fraud, theft and unlawful burning.

Whatever the authority for promulgation of Part 12 in 1977, I find that the scope and character of its provisions are incompatible with jurisdiction granted to both the Navajo and Hopi Tribes over partitioned lands by the 1980 Amendments Act. Accordingly, after January 8, 1982, Part 12 will be of no further force and effect.

The conclusions which I have reached are not intended to favor or punish either tribe nor are they based on any past actions, or inactions of the Secretary or agencies operating under the Interior Department. These were relevant considerations by Congress and were presumably considered by that body prior to the enactment of the 1980 Amendments Act. It can be said, based upon the legislative record, that Congress intended that the 1980 Act would provide increased tribal jurisdiction over partitioned land and that this resolve came about in part because of dissatisfaction with what had been done by the Executive Branch of government.

Treaty considerations aside, it is Congress that decides what rights of self-determination shall be afforded a tribe and the extent to which the Secretary and those who act for him can manage or control actions by tribal members or others on reservation land.

It has been my responsibility to determine what Congress intended by enactment of the 1980 Amendments Act and to enter an order which would effectuate that intention. I have extended this opinion beyond summary findings of fact and conclusions of law so that each tribe and any appellate court can have an understanding of why I enter the Order which follows.

CONCLUSIONS

1. The Secretary of the Interior had until January 8, 1982, to complete the livestock reduction program required by 25 U.S.C. § 640d–18(a).

2. Any grazing permits issued by the Secretary of the Interior shall be effective until the termination date in the permit, not to exceed one year from date of issuance;

3. All conservation practices undertaken by the Secretary of the Interior, including grazing control and range restoration activities, shall be coordinated and executed by the Secretary with the concurrence of the tribe to whom the particular lands in question have been partitioned;

4. Each tribe shall have jurisdiction and authority over any lands partitioned to it and all persons located thereon subject to the responsibility of the Secretary to protect the rights and property of life tenants and persons awaiting relocation;

5. The Secretary shall have the right to take such action as he deems necessary in order to protect the rights and property of life tenants and persons awaiting relocation. Any actions taken by the Secretary for this reason shall be by written order, with appropriate findings of fact which justify the action. Any Secretarial Order shall be subject to review by this Court upon timely application of either tribe. Such order shall, unless stayed by the Court, be effective pending review.

Accordingly,

IT IS ORDERED that Plaintiff Hopi Tribe shall, within ten days from this date, lodge a proposed form of Judgment with the Court and Defendant and Intervenor shall have ten days thereafter within which to file objections, after which any such objections will be set for oral argument.