PEABODY COAL COMPANY, A Delaware corporation; Southern California Edison Company, a California corporation, Plaintiffs-Appellees,

Ferrell Secakuku, Chairman of the Hopi Tribal Counsel of the Hopi Tribe, Intervenor-Appellant,

v.

The NAVAJO NATION, Cross-Claim-Defendant-Appellee.

PEABODY COAL COMPANY, A Delaware corporation; Southern California Edison Company, a California corporation, Plaintiffs-Appellants,

Ferrell Secakuku, Chairman of the Hopi Tribal Counsel of the Hopi Tribe, Intervenor-Appellee,

v.

The NAVAJO NATION, Cross-Claim-Defendant-Appellee.

PEABODY COAL COMPANY, a Delaware corporation, Plaintiff,

Ferrell Secakuku, Chairman of the Hopi Tribal Counsel of the Hopi Tribe, Intervenor-Appellant,

v.

The NAVAJO NATION, Cross-Claim-Defendant-Appellee.

Nos. 94-15647, 94-15650 and 94-16622.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 14, 1995.

Decided Jan. 16, 1996.

Jeffrey B. Smith, O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, Phoenix, Arizona; Robert B. Hoffman, Snell & Wilmer, Phoenix, Arizona, for plaintiffs-cross-appellants.

Alfred T. McDonnell and James E. Scarboro, Arnold & Porter, Denver, Colorado, for intervenor-appellant.

Eric N. Dahlstrom and Michael C. Shiel, Rothstein, Donatelli, Hughes, Dahlstrom, Cron & Schoenburg, Phoenix, Arizona, for defendant-appellee.

Before: CHOY, WIGGINS, and LEAVY, Circuit Judges.

CHOY, Circuit Judge:

### Introduction

These consolidated appeals present another chapter in the long-standing controversy between the Hopi and Navajo over governing reservation lands in northeastern Arizona. These appeals arise from the District of Arizona and present two issues. First, did the district court, Judge Strand presiding, err in holding that the Navajo have exclusive governmental power over the Navajo Partitioned Lands to the extent that the Navajo may unilaterally impose a Possessory Interest Tax and Business Activity Tax on Peabody's mining activity? And second, did the district court, Judge Van Sickle presiding, err in holding that taxes imposed by the Navajo on Peabody's mining activities are not "proceeds" under 25 U.S.C. § 640d–6 which must be shared with the Hopi? We affirm the holding of Judge Strand and reverse the holding of Judge Van Sickle.

### Factual Background

These appeals concern the former "Joint Use Area" as designated by the United States District Court in *Healing v. Jones,* 210 F.Supp. 125 (D.Ariz.1962). In *Healing,* a three-judge district court panel held that, subject to the trust title of the United States, the Hopi and Navajo shared an undivided interest in the Joint Use Area.

Congress enacted the Navajo–Hopi Land Settlement Act of 1974, 25 U.S.C. § 640d (the "Settlement Act") in an effort to end conflicts between the Hopi and Navajo which persisted after the *Healing* decision. The Settlement Act authorized the district court to partition the Joint Use Area into Navajo and Hopi lands. With respect to the subsurface mineral estate, section 7 of the Settlement Act provides:

> Partition of the surface of the lands of the joint use area shall not affect the joint ownership status of the coal, oil, gas, and all other minerals within or underlying such lands. All such coal, oil, gas, and other minerals within or underlying such lands shall be managed jointly by the two tribes, subject to supervision and approval by the Secretary as otherwise required by law, and the proceeds therefrom shall be divided between the tribes, share and share alike.

25 U.S.C. § 640d–6.

On February 10, 1977 the district court entered the first judgment of partition. We vacated this judgment to allow the district court to determine properly the boundaries of the 1882 Reservation. *Sekaquaptewa v. MacDonald,* 575 F.2d 239 (9th Cir.1978). On April 18, 1979 the district court entered the second and final judgment partitioning the Joint Use Area into the Hopi Partitioned Lands and the Navajo Partitioned Lands. *Sekaquaptewa v. MacDonald,* D.C. No. Civ. 579 Pct. (D.Ariz.1979), *aff'd,* 626 F.2d 113 (9th Cir.1980).

The mining activity in this litigation dates back to 1966. In that year, Sentry Royalty Company entered into separate leases with the Hopi and Navajo to mine coal from the Joint Use Area (respectively, the "1966 Hopi Lease" and the "1966 Navajo Lease"). In 1968, Sentry assigned its rights in these leases to the Peabody Coal Company. In 1970, Peabody began operating two mines, the Kayenta Mine and the Black Mesa Mine, within the Joint Use Area.

The land leased under the 1966 Hopi Lease and the 1966 Navajo Lease was entirely within the former Joint Use Area. The

partition line drawn by the 1979 judgment did not equally divide these two mines. Rather, after partition ninety percent of the land leased to Peabody is now located on the Navajo side of the line. The proceeds from the two mines are subject to the "share and share alike" provision of section 7.

In 1978, the Navajo enacted two taxes, the Possessory Interest Tax ("PIT") and the Business Activity Tax ("BAT"). Both the PIT and BAT apply to Peabody's mining activity on the Navajo Partitioned Lands. The United States Supreme Court upheld the validity of both taxes in *Kerr–McGee Corp. v. Navajo Tribe*, 471 U.S. 195, 105 S.Ct. 1900, 85 L.Ed.2d 200 (1985).

### Procedural Background

This action was filed on September 16, 1988 by Peabody and Southern California Edison (collectively, "Peabody") seeking declaratory relief. Southern California Edison operates the Mohave Generating Station and is an interested party because taxes levied on Peabody are passed through to Edison. Peabody claimed that the PIT violated § 640d–6 of the Settlement Act because the tax lacked approval of the Hopi and the Secretary. The Hopi moved to intervene and file a cross-claim against the Navajo. The Hopi's cross-claim alleged that both the PIT and BAT were "proceeds" under § 640d–6. The Hopi claimed entitlement to one-half of the taxes imposed by the Navajo on mining activity within the former Joint Use Area. On April 20, 1989 the Hopi's motion to intervene and cross-claim was granted.

On February 12, 1990 Peabody filed a motion for summary judgment claiming that the PIT violated section 7. The Hopi filed their own motion for summary judgment on March 16, 1990. The Hopi's motion contained two alternative claims. First, the Hopi claimed that the PIT and BAT were invalid because they lacked the approval of the Hopi who remained a co-sovereign over the subsurface mineral estate of the former Joint Use Area. And second, the Hopi claimed that the PIT and BAT were "proceeds" from the subsurface mineral estate subject to the "share and share alike" provision of § 640d–6.

Judge Strand denied Peabody's motion. With regard to the Hopi's motion, Judge Strand denied their first claim. He ruled that the Navajo have exclusive sovereignty over the Navajo Partitioned Lands including the subsurface mineral estate. Judge Strand granted the Hopi's alternative claim. He held that the Navajo's PIT and BAT, to the extent they constitute value derived from the minerals, must be shared with the Hopi.

The Hopi filed a second motion for summary judgment on August 14, 1991. The Hopi claimed entitlement to an undisputed amount of past taxes which had been collected or waived by the Navajo. This motion was denied. Judge Strand ruled that there was a genuine issue of material fact with respect to what extent the PIT and BAT were value derived from the minerals rather than from the surface activity of Peabody on Navajo land.

Trial took place before Judge Van Sickle. The Hopi presented evidence to establish that the PIT and BAT were value derived from the coal. The Navajo presented contrary evidence. At the conclusion of the trial, Judge Van Sickle ruled that Judge Strand's interpretation of the Settlement Act was erroneous. Judge Van Sickle interpreted the term "proceeds" in § 640d–6 to include only value arising from a "commercial transaction." Because taxes are not derived from a commercial transaction, Judge Van Sickle ruled that no portion of the PIT or BAT were proceeds of the coal which must be shared with the Hopi.

### Analysis

1. The district court, Judge Strand presiding, properly ruled that the Navajo have exclusive governmental power over the Navajo Partitioned Lands to the extent that the Navajo may unilaterally impose the Possessory Interest Tax and Business Activity Tax on Peabody's mining activity.

Resolution of this issue involves answering two questions because the Hopi and Peabody have presented alternative theories in challenging the taxes. First, do the Navajo have sovereign governmental power, to the exclusion of the Hopi, over both the surface and

subsurface of the Navajo Partitioned Lands? The Hopi claim, in appeal No. 94–15647, that they are co-sovereigns over the subsurface and that the Navajo may not unilaterally impose the PIT and BAT.

Second, even if the Navajo have exclusive sovereignty over the subsurface, does the unilateral imposition of the PIT violate § 640d–6 of the Settlement Act? Peabody claims, in appeal No. 94–15650, that the unilateral imposition of the PIT violates § 640d–6 because the tax lacks approval of the Hopi and the Secretary.

**A. The Navajo have sovereign governmental power, to the exclusion of the Hopi, over both the surface and subsurface of the Navajo Partitioned Lands.**

■ This issue involves interpreting the 1974 Settlement Act and its subsequent amendments to determine if Congress intended to grant the Navajo exclusive jurisdiction. Questions of law are reviewed de novo. *United States v. Yacoubian,* 24 F.3d 1, 3 (9th Cir.1994).

The district court, Judge Strand presiding, ruled that the Navajo have an exclusive governmental interest in the Navajo Partitioned Lands "from the top of the sky to the center of the Earth." The Hopi appeal this ruling. The Hopi contend that they were co-sovereigns over the subsurface of the Joint Use Area, and that nothing in the Settlement Act diminished this sovereignty. The Hopi point to 25 U.S.C. § 640d–6 as evidence that Congress intended to continue joint sovereignty over the subsurface. Peabody and the Navajo respond that the Settlement Act, and its amendments, granted the Navajo exclusive jurisdiction over both the surface and subsurface.

The Settlement Act authorized the district court to partition the Joint Use Area. 25 U.S.C. § 640d–3. The Act addresses ownership of the subsurface mineral estate in section 7, codified at 25 U.S.C. § 640d–6:

Partition of the surface of the lands of the joint use area shall not affect the *joint ownership* status of the coal, oil, gas, and all other minerals within or underlying such lands. All such coal, oil, gas, and other minerals within or underlying such

lands shall be *managed jointly* by the two tribes, subject to supervision and approval by the Secretary as otherwise required by law, and the proceeds therefrom shall be divided between the tribes, share and share alike.

(Emphasis added).

25 U.S.C. § 640d–9 addresses tribal jurisdiction over partitioned lands. The relevant provisions of this section provide:

(a) ... any lands partitioned to the Navajo Tribe pursuant to sections 640d–2 and 640d–3 of this title ... shall be held in trust by the United States *exclusively* for the Navajo Tribe and as part of the Navajo Reservation.

(b) ... any lands partitioned to the Hopi Tribe pursuant to sections 640d–2 and 640d–3 of this title ... shall be held in trust by the United States *exclusively* for the Hopi Tribe and as part of the Hopi Reservation.

*Id.* (emphasis added).

The legislative history provides guidance in determining whether Congress intended the Navajo to have exclusive jurisdiction over both the surface and subsurface. The introduction to the Senate Report states: "The purpose of H.R. 10337, as amended, is to provide for the settlement of the conflicting rights and interests of the Hopi and Navajo Tribes.... The court has stated and, now, the tribes themselves are agreed that no final resolution can occur absent the enactment of legislation." S.Rep. No. 93–1177, 93rd Cong., 2d Sess. 10–11 (1974). The sections of the Senate Report which address the subsurface mineral estate and tribal jurisdiction merely restate the plain language of the Act. *See id.* at 31, 33; *See also* H.Rep. No. 93–909, 93rd Cong., 2d Sess. (1974); H.Rep. No. 92–1221, 92d Cong., 2d Sess. (1972).

The district court entered the first judgment of partition on February 10, 1977. This judgment divided the Joint Use Area and ruled that the partitioned lands would be held by the United States in trust exclusively for each tribe and "absolutely free" from claims by the other tribe. We vacated and remanded the first judgment of partition to allow the district court to determine properly

the boundaries of the 1882 Reservation. *Sekaquaptewa v. MacDonald,* 575 F.2d 239 (9th Cir.1978). On April 18, 1979 the district court entered the second and final judgment of partition which incorporated the jurisdictional provisions of the first judgment. *Sekaquaptewa v. MacDonald,* D.C. No. Civ. 579 Pct. (D.Ariz.1979), *aff'd,* 626 F.2d 113 (9th Cir.1980).

The Settlement Act was amended in 1980. The amendments included a provision which clarified tribal jurisdiction over partitioned lands:

> (1) Lands partitioned pursuant to this subchapter, whether or not the partition order is subject to appeal, shall be subject to the jurisdiction of the tribe to whom partitioned and the laws of such tribe shall apply to such partitioned lands under the following schedule:
>
> . . . .
>
> (B) Notwithstanding any provision of law to the contrary, each tribe shall have such jurisdiction and authority over any lands partitioned to it and all persons located thereon ... *to the same extent as is applicable to those other portions of its reservation.*

25 U.S.C. § 640d–9(e)(1)(B) (emphasis added). The conference report accompanying this amendment states: "While there is some ambiguity about the existing state of the law in this regard, this provision makes clear that the complete jurisdiction of the relevant tribe will be in effect on [April 18, 1981]." H.Rep. No. 96–1094, 96th Cong., 2d Sess. 14 (1980).

In *Hopi Tribe v. Watt,* 530 F.Supp. 1217 (D.Ariz.1982), *aff'd,* 719 F.2d 314 (9th Cir. 1983), the district court interpreted the 1980 amendments to the Settlement Act. The issue presented in *Watt* was whether the Interior Department could administer grazing on Hopi lands without the consent of the Hopi. With regard to § 640d–9(e)(1)(B), the district court concluded that Congress intended this section to give each tribe greater jurisdiction and control over their respective lands. *Watt,* 530 F.Supp. at 1228.

█ We affirm Judge Strand's ruling that the Navajo have an exclusive governmental interest in the Navajo Partitioned Lands

"from the top of the sky to the center of the Earth." Both the plain language of the Settlement Act and its legislative history demonstrate that Congress intended to create two separate reservations. A decision by this court that the Hopi share a sovereignty interest in the subsurface mineral estate of the Navajo Partitioned Lands, as opposed to an ownership interest, would engender future controversy over governing the subsurface which Congress sought to avoid.

The jurisdictional provisions of the Settlement Act are clear. Sections 640d–9(a) and (b) provide that the partitioned lands are held in trust "exclusively" for each tribe. It is difficult to imagine that Congress intended to continue joint sovereignty over the subsurface in light of this language. The 1980 amendments to the Settlement Act are even clearer. Section 640d–9(e)(1)(B) states that "[n]otwithstanding any provision of law to the contrary," the Navajo have jurisdiction and authority over their partitioned lands to the same extent as other portions of their reservation. Since the Navajo have exclusive governmental authority over the surface and subsurface of other portions of their reservation, it follows that Congress intended the same for the Navajo Partitioned Lands.

We simply cannot accept the Hopi's argument that the Settlement Act did not partition sovereignty rights in the subsurface. The Hopi's position extends not only to the 40,000 acre parcel leased to Peabody, but to the entire 1.8 million acre former Joint Use Area. Considering the plain language of the Act and the Congressional purpose to provide a "final resolution" to the conflicts between the Hopi and Navajo, we are compelled to affirm the judgment of Judge Strand.

█ Section 7 of the Settlement Act, codified at 25 U.S.C. § 640d–6, is consistent with our holding. Section 7 does not provide for joint sovereignty or jurisdiction over the subsurface. Rather, it addresses "joint ownership" and states that the minerals shall be "managed jointly." Section 7 was included because the location of the minerals was unclear at the time of partition. *See* S.Rep. No. 93–1177, 93rd Cong., 2d Sess. 45 (1974). This section ensures that the proceeds from

any minerals on the former Joint Use Area will be divided, "share and share alike."

The Supreme Court has recognized this distinction between a jurisdictional and an ownership interest on a reservation. In *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982), the Supreme Court addressed the taxing power of the Jicarilla Apache Tribe over mineral lessees on their reservation. The Court in *Merrion* explained that an Indian tribe can occupy both the position of a landowner and a sovereign with respect to the reservation's mineral estate. *Id.* at 138, 102 S.Ct. at 902. "The royalty payments from the mineral leases are paid to the Tribe in its role as partner in petitioners' commercial venture. The severance tax, in contrast, is petitioners' contribution 'to the general cost of providing governmental services.'" *Id.* (quoting *Commonwealth Edison Co. v. Montana*, 453 U.S. 609, 623, 101 S.Ct. 2946, 2956–57, 69 L.Ed.2d 884 (1981)). Applying this principle to the controversy between the Hopi and Navajo, we conclude that Congress intended the Navajo to have both an ownership and a governmental interest with respect to the subsurface, but intended the Hopi to have only an ownership interest therein.

The Hopi cite this court's decisions in the *Crow* cases to support their argument that they are co-sovereigns with respect to the subsurface. In *Crow Tribe of Indians v. Montana*, 650 F.2d 1104 (9th Cir.1981), *amended*, 665 F.2d 1390 (9th Cir.), *cert. denied*, 459 U.S. 916, 103 S.Ct. 230, 74 L.Ed.2d 182 (1982) ("Crow I"), we noted that it was possible for an Indian tribe to retain an interest in the subsurface of lands but not the surface. *Id.* at 1107. And in *Crow Tribe of Indians v. Montana*, 819 F.2d 895 (9th Cir.1987), *aff'd*, 484 U.S. 997, 108 S.Ct. 685, 98 L.Ed.2d 638 (1988) ("Crow II"), we held that the minerals in the subsurface were actually part of the Crow Tribe's reservation while the tribe had no interest in the surface of the same lands. *Id.* at 902.

Our decisions in the *Crow* cases are distinguishable and do not support the Hopi's claim. We held the subsurface to be part of the Crow's reservation because an act of Congress provided for this status. *See* Act of May 19, 1958, 72 Stat. 121. Here, the Hopi's sovereignty interest in the Navajo Partitioned Lands was terminated by the Settlement Act. There is no comparable statute in this case which grants the Hopi jurisdiction over the subsurface of the Navajo lands.

■ The Hopi cite the diminishment cases for the proposition that "Congress must affirmatively and clearly evidence its intention to abrogate a tribe's sovereign interest—and the lack of any such evidence here—further support continued Hopi sovereignty over the [former Joint Use Area] mineral estate." Appellant's Opening Brief at 15 n. 38. The problem with the Hopi's argument is that this is not a diminishment case. A diminishment case arises when Congress authorizes the sale of reservation lands to non-Indians, and the issue arises whether Congress intended these lands to remain part of the reservation under tribal jurisdiction. *See Hagen v. Utah*, —— U.S. ——, 114 S.Ct. 958, 127 L.Ed.2d 252 (1994); *Solem v. Bartlett*, 465 U.S. 463, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984). Here, the Settlement Act did not diminish or open the Joint Use Area for sale to non-Indians. Rather, the Act divided the Joint Use Area into two separate reservations. Thus, the concern of protecting Indian sovereignty from encroachment by non-Indians is not present in this case. More importantly, Congressional intent to terminate the Hopi's sovereignty interest in the Navajo Partitioned Lands is clear.

In conclusion, we hold that the Navajo have an exclusive governmental interest in both the surface and subsurface of their partitioned lands.

B. The unilateral imposition of the PIT by the Navajo does not violate section 7 of the Settlement Act.

This issue involves interpreting the 1974 Settlement Act. Questions of law are reviewed de novo. *United States v. Yacoubian*, 24 F.3d 1, 3 (9th Cir.1994).

The district court, Judge Strand presiding, ruled that the PIT does not violate section 7 of the Settlement Act. Peabody appeals this ruling. Peabody claims that the Navajo's

PIT violates section 7 because it (1) lacks Hopi approval, and (2) lacks Secretarial approval. Peabody does not challenge the validity of the BAT.

■ We hold that the PIT does not violate the Settlement Act. The PIT does not require Hopi approval because imposition of this tax does not constitute management of the subsurface mineral estate. Section 7 provides in relevant part: "All such coal, oil, gas, and other minerals within or underlying such lands shall be managed jointly by the two tribes...." 25 U.S.C. § 640d–6. This section grants the Hopi a management interest in the coal. As discussed above, section 7 does not grant the Hopi a governmental interest.

The distinction between an ownership interest and a governmental interest recognized in *Merrion* and discussed above is equally applicable to this issue. In *Merrion*, the Supreme Court drew a sharp distinction between the ability of a tribe to enter into leases as a commercial partner, and the ability of the same tribe to impose taxes under its governmental authority. *Merrion*, 455 U.S. at 138, 102 S.Ct. at 902. The Navajo may unilaterally impose the PIT because the tribe acts in its governmental role when it imposes this tax. By contrast, when the Navajo enter into mining leases with Peabody, the joint management provision of section 7 requires Hopi consent.

■ The PIT is valid despite lack of Secretarial approval. Section 7 does not, standing alone, require approval of the Secretary. Rather, Secretarial approval is mandated only when "otherwise required by law." Peabody claims that 25 U.S.C. § 81 is a law which otherwise requires such approval. Peabody is mistaken. 25 U.S.C. § 81 provides in relevant part:

> No agreement shall be made by any person with any tribe of Indians, or individual Indians not citizens of the United States, for the payment or delivery of any money or other thing of value, in present or prospective, or for the granting or procuring of any privilege to him, or any other person in consideration of services for said Indians relative to their lands ... unless

such *contract or agreement* be [approved by the Secretary].

(Emphasis added). The PIT is not a contract or agreement. Therefore, 25 U.S.C. § 81 does not mandate Secretarial approval.

The Supreme Court upheld the validity of the PIT and BAT in *Kerr–McGee Corp. v. Navajo Tribe*, 471 U.S. 195, 105 S.Ct. 1900, 85 L.Ed.2d 200 (1985). *Kerr–McGee* held that the Navajo may unilaterally impose taxes unless Congress has mandated Secretarial approval. With respect to 25 U.S.C. § 81, the very statute Peabody relies upon, the Supreme Court held: "[W]e do not believe that statutes requiring Secretarial supervision in other contexts, see, *e.g.*, 25 U.S.C. §§ 81, 311–321, reveal that Congress has limited the Navajo Tribal Council's authority to tax non-indians." *Id.* at 200, 105 S.Ct. at 1904.

In conclusion, we hold that the PIT does not violate the Settlement Act.

2. The district court, Judge Van Sickle presiding, erred in ruling that the taxes imposed by the Navajo on Peabody's mining activities are not "proceeds" under 25 U.S.C. § 640d–6 which must be shared with the Hopi.

■ The Hopi and Navajo disagree as to the appropriate standard of review. The Hopi argue that de novo review applies because this is an issue of law. The Navajo argue that this court should give "deference" to the district court because this is a mixed question of law and fact. The Hopi are correct. We must decide whether Congress intended the term "proceeds" in 25 U.S.C. § 640d–6 to include the two Navajo taxes. This is a question of law to be reviewed de novo. *United States v. Yacoubian*, 24 F.3d 1, 3 (9th Cir.1994). Even if this was a mixed question of law and fact, de novo review would still apply. *Boone v. United States*, 944 F.2d 1489, 1492 (9th Cir.1991) ("The application of a rule of law to established facts is reviewed de novo when the question requires consideration of legal concepts in mix of facts and law.").

Resolution of this issue requires answering two questions. First, did Judge Van Sickle correctly interpret "proceeds" to mean value

**466**

arising from a "commercial transaction" so as to exclude all taxes? Second, if Congress intended a broader definition, such as all benefit derived from the jointly owned coal, are the PIT and BAT benefits derived from the coal?

### A. Definition of "Proceeds."

Judge Van Sickle held that the PIT and BAT are not "proceeds" which must be shared pursuant to 25 U.S.C. § 640d–6 because these taxes are not a product of a commercial transaction. The Hopi appeal this ruling in appeal No. 94–16622. They claim that Judge Van Sickle's interpretation of "proceeds" is contrary to the plain meaning of the Settlement Act. The Navajo respond that the plain meaning of "proceeds" does not include these two taxes and that a broad definition of this statutory term will produce absurd results.

Judge Strand originally held that the term "proceeds" in § 640d–6 does include the PIT and BAT. Judge Strand reasoned:

Section 640d–6 of the 1974 Navajo–Hopi Settlement Act provides that all such coal underlying such lands shall be managed jointly by the two tribes and proceeds therefrom shall be divided between the tribes, share and share alike. It is the finding, construction, and conclusion of the Court that that terminology means that regardless of the mechanism or manner by which economic value is achieved by any party because of the coal, that economic value must be shared, whether it be called a tax, a price per ton, a royalty, or anything else.

Transcript of Proceedings, June 4, 1990, at 43–44.

The Hopi subsequently filed their second motion for summary judgment claiming entitlement to an undisputed amount of back taxes. In an *Order* dated June 2, 1993, Judge Strand denied this motion and defined the issues remaining for trial:

The Navajo Tribe argues that the Hopi Tribe offers no proof of the fair value of any benefits received by the Navajo Nation in exchange for the waiver or abatement of taxes. However, the Navajo Tribe bears the burden of showing that the economic benefit derived by the taxes is not *related* to the coal that underlies the land, and/or that the economic benefit must be *offset* because of the detriment that may have arisen "by virtue of the fact that the mining property itself is on the Navajo property and imposes costs uniquely on that tribe as opposed to the Hopi Tribe."

Order of Judge Strand, June 2, 1993, at 6 (emphasis added).

This case went to trial before Judge Van Sickle. The Hopi presented evidence on the amount of taxes collected or waived by the Navajo. The Navajo responded with evidence on the "relatedness" and "offset" issues. The Navajo also introduced evidence supporting their affirmative defenses of waiver, estoppel, and laches. Judge Van Sickle did not reach the "relatedness" and "offset" issues, nor did he reach the affirmative defenses raised by the Navajo. Rather, Judge Van Sickle interpreted the term "proceeds" narrowly and held that no portion of the Navajo's PIT and BAT must be shared with the Hopi.

Judge Van Sickle first reviewed various dictionary definitions in interpreting the term "proceeds." Judge Van Sickle concluded

that although there is no single meaning which can be assigned to the word, a common theme found in all definitions is that proceeds are *value arising from a commercial transaction,* such as "the money or profit derived from a sale, business venture, etc." Webster's New World Dictionary 1072 (Third College Ed.1988).

860 F.Supp. 683, 691 (emphasis added). Applying this definition, Judge Van Sickle reasoned that since taxes do not derive from a commercial transaction, they are not proceeds which must be shared pursuant to the Act.

Judge Van Sickle noted that broader definitions of "proceeds" would include taxes. He therefore turned to the legislative history of the Settlement Act. Judge Van Sickle quoted S.Rep. No. 93–1177, which reads: "Section 7 preserves the joint ownership by both tribes of coal, oil, gas and other minerals within and underlying the joint use area."

S.Rep. No. 93–1177, 93rd Cong., 2d Sess. 21 (1974). Judge Van Sickle stated that nothing in the plain language of the Settlement Act evidences a Congressional intent to have all economic consequences from the coal equalized. 860 F.Supp. at 692.

Judge Van Sickle relied on an additional reason for a narrow interpretation of the term "proceeds." He stated that a broad definition would produce absurd results. He believed that a definition of "proceeds" broad enough to include taxes would spawn litigation, be inconsistent with each tribe's sovereignty, and be beyond judicial competence. Therefore, he did not believe that Congress intended "proceeds" to include taxes.

 We disagree with Judge Van Sickle's interpretation of section 7. Judge Van Sickle's interpretation of "proceeds" as "value arising from a commercial transaction" is puzzling in itself. Judge Van Sickle did not rely on a particular definition from a dictionary but rather discerned a "common theme found in all definitions." 860 F.Supp. at 691. Judge Van Sickle's common theme of "commercial transaction" excludes the PIT and BAT because taxes are levied by a sovereign. Most dictionary definitions of "proceeds" would include taxes. Webster's Third New International Dictionary, Unabridged, defines "proceeds" as:

> 1 a: What is produced by or derived from something (as a sale, investment, *levy*, business) by way of total revenue: the total amount brought in: YIELD, RETURNS (the—from the sale of the paintings were considerable) (*estimated that the—from such taxes would be enormous*) b: the net profit made on something ... 2: the net sum received (as for a check, a negotiable note, an insurance policy) after deduction of any discount or charges.

(Emphasis added). The first definition of "proceeds" in Webster's specifically refers to taxes. Black's Law Dictionary, 6th edition, defines proceeds as:

> Issues; income; yield; receipts; produce; money or articles or other thing of value arising or obtained by the sale of property; the sum, amount, or value of property sold or converted into money or into other property. Proceeds does not

necessarily mean only cash or money. That which results, proceeds, or accrues from some possession or transaction. The funds received from disposition of assets or from the issue of securities (after deduction of all costs and fees).

(Citations omitted).

The United States Supreme Court has interpreted the term "proceeds" broadly. In *Phelps v. Harris,* 101 U.S. 370, 25 L.Ed. 855 (1879), the Supreme Court explained that lands received from the disposition of real estate fall under the definition of "proceeds." The Court wrote: "Proceeds are not necessarily money. *This is a word of great generality.*" *Id.* at 380 (emphasis added).

These definitions of "proceeds" illustrate that the common meaning is broader than Judge Van Sickle believed. The common definition is more akin to "what is produced by or derived from something," "the total amount brought in," or "that which results, proceeds, or accrues from some possession or transaction." Applied to the Settlement Act, these common definitions would require the Navajo to share all economic benefit derived from the coal, including taxes.

The legislative history of the Settlement Act supports this broad definition. Judge Van Sickle may have overlooked an important piece of legislative history contained in the same Senate Report upon which he relied. A letter from the Commissioner of Indian Affairs, explaining the "share and share alike" provision, states: "We agree that continued joint ownership of the beneficial interest in the mineral rights within the joint-use area is necessary: since the area's mineral values are unknown, it would be impossible to divide them equitably." S.Rep. No. 93–1177, 93rd Cong., 2d Sess. 45 (1974) (letter of Morris Thompson, Commissioner of Indian Affairs). This letter indicates that Congress did intend to have both tribes share all economic value derived from the coal.

Judge Van Sickle believed that a definition of "proceeds" broad enough to include the PIT and BAT would "spawn excessive litigation, would be inconsistent with each tribe's national sovereignty, and would likely be be-

yond judicial competence." 860 F.Supp. at 692. He did not believe such an absurd result was intended by Congress.

■■■■ The absurd result doctrine applies where a court must pass upon an ambiguous statute. The doctrine has no application where a statute is clear. "Judicial perception that a particular result would be unreasonable may enter into the construction of ambiguous provisions, but cannot justify disregard of what Congress has plainly and intentionally provided." *Commissioner v. Asphalt Prods. Co.*, 482 U.S. 117, 121, 107 S.Ct. 2275, 2277–78, 96 L.Ed.2d 97 (1987). Because we hold that Congress plainly and intentionally intended the term "proceeds" to include all economic value derived from the minerals, Judge Van Sickle was not justified in relying on the absurd result doctrine. Even if we believed that the term "proceeds" is ambiguous, a broad definition of "proceeds" will not produce absurd results. An interpretation that may require litigation, to determine the extent to which the Navajo are entitled to an "offset," is not unreasonable. This is a necessary result of a complicated and unique statutory provision.

In conclusion, we hold that Congress intended the term "proceeds" to mean "all economic benefit derived from the minerals."

B. Are the PIT and BAT economic benefits derived from the coal?

■■■■ The PIT is a tax imposed on possessory interests within the Navajo Nation. 24 N.T.C. § 202. A "possessory interest" is defined as "the property rights under a lease granted by the Navajo Tribe, including the rights to the lease premises and underlying natural resources." 24 N.T.C. § 204. The value of the property rights that are taxed is computed by determining the gross income to be realized on the lease less certain deductions. 24 N.T.C. § 205(c).[1]

1. The Navajo Tribal Code provides for alternative valuation methods. *See* 24 N.T.C. § 205. Our holding does not turn on which method the Navajo utilize.

2. The Navajo argue, on the basis of Professor Hellerstein's trial testimony, that it is not unusual for a sovereign to tax one joint owner and not others. Regardless of whether this is a usual

Because the PIT is a tax on the rights to the "underlying natural resources," a plain reading of this tax indicates that it is a benefit derived from the jointly-owned coal. Yet, the Navajo contend that only their portion of the coal is taxed because they exclude one-half of the value of the leasehold granted in the coal. "[T]he only income used in the calculation of the PIT is produced by Peabody mining and processing Navajo coal, since the Hopi coal interest is entirely excluded from the PIT calculation." Answering Brief for Appellee/Cross–Appellee at 8. We reject the Navajo's argument.

The district court held in *Healing* that the Navajo and Hopi had a "joint, undivided, and equal" interest in the Joint Use Area. The Settlement Act did not affect this ownership interest with respect to the subsurface. If the Navajo exclude one-half of the value of the leasehold from the PIT, then the tax is still imposed on one-half of the Navajo's interest and one-half of the Hopi's interest. The Navajo's attempt to divide an otherwise "undivided" interest in the coal is not persuasive. The PIT constitutes "proceeds" which must be shared pursuant to the Act.[2]

■■■■ The BAT is a tax imposed on the source-gains of any person or business. 24 N.T.C. § 402. As applied to Peabody, source-gains are the gross receipts from the sale of processed coal less certain deductions. 24 N.T.C. § 404. The Hopi argue that the BAT is a benefit derived from the coal because the tax is based on the sale price of the coal. The Hopi further argue that royalties and taxes were treated alike during lease negotiations because there is a royalty-tax cap in the lease amendments. The Navajo respond that the BAT does not tax the value of the coal, but rather only the economic activity of Peabody in transforming the coal into a saleable product.

practice, the taxes still are a benefit derived from Hopi coal. The Navajo also argue that their taxes are uniformly applicable and are a valid exercise of taxing authority. Again, despite the applicability and validity of the taxes, they still are a benefit derived from the coal and thus are "proceeds."

The Navajo's argument is complex. They explain that the royalties consist of 12.5% of the coal's sale price ($2.57 per ton in royalties, based on a sale price of $20.57 per ton). The Navajo further explain that the BAT is levied on the $18.00 added to the value of the coal ($20.57 minus $2.57) because the royalties are not included in the tax base. Because the BAT is levied on the business activity associated with adding an additional $18.00 per ton to the in situ value of the coal, the Navajo conclude that the BAT is not a benefit derived from the coal itself.[3]

We reject the Navajo's argument and hold that the BAT is a benefit derived from the coal. The BAT is computed in the same manner as the royalties; both are based on the sale price of the coal. The fact that the Navajo only impose the tax on $18.00 of the sale price, as opposed to the full $20.57, is irrelevant. The bottom line is that the Navajo are receiving benefit from the coal. This court's decisions in the *Crow* cases supports our holding. These decisions illustrate that there is no substantive difference between a tribe deriving benefit through royalties or a tax. In *Crow I,* this court wrote:

> Tribal economic enterprise is unique in that a tribe often engages in economic activity while simultaneously exercising more traditional governmental functions, such as taxation, with respect to the same activity. As a result, a tribe may obtain revenues either by manipulating the price of the goods it sells or by taxing its trading partners, where the tribe has taxing power. Which method a tribe chooses should be a matter of economic indifference to the parties, at least at the outset of the transaction.

650 F.2d 1104, 1116. And in *Crow II,* this court wrote:

> The state taxes increase the costs of production by the coal producers, reducing in turn the royalty that can be paid the Tribe.

The taxes also forced the coal producers to charge higher prices, reducing the demand for their Montana coal and resulting in fewer sales for the producers and fewer royalties to the Tribe.

819 F.2d 895, 899.

The reasoning from the *Crow* cases is applicable to this case. First, whether the Navajo take a percentage of the coal's sale price as a royalty or a tax, there is no economic difference to either Peabody or the Navajo. The royalty-tax cap evidences this point. Second, to the extent the BAT increases the cost of production to Peabody, less royalties can be paid to the Hopi. Consequently, the purpose of the "share and share alike" requirement is defeated.

We hold that the plain meaning of "proceeds" is "all economic benefit derived from the coal," and that the PIT and BAT are benefits derived from and are entirely related to the coal.[4]

### Conclusion

On remand the Hopi shall have the burden of persuasion to prove the amount of value which the Navajo have received from the PIT and BAT whether collected, waived, or abated. The Navajo shall have the burden of persuasion to prove the extent to which they are entitled to an "offset" due to unique expenses resulting from the location of the mining on Navajo land. We decline to reach the Navajo's affirmative defenses or the Hopi's argument regarding prejudgment interest. These issues are properly reserved for the district court.

Judgment of Judge Strand AFFIRMED, judgment of Judge Van Sickle REVERSED, and REMANDED. The parties shall bear their own costs on this appeal.

---

3. These figures are derived from the evidence adduced by the Navajo at trial. We present these figures only to illustrate the Navajo's argument.

4. We modify Judge Strand's ruling to the limited extent that he believed the "relatedness" of the

taxes to the coal was an issue to be determined at trial. Because we hold that the PIT and BAT are entirely related to the value of the coal, this issue need not be determined on remand.